IN THE UNITED STATES DISTRICT COURT FOR

THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| MCGARRY & MCGARRY, LLC,<br><br>                              Plaintiff,<br><br>                    -v-<br><br>BANKRUPTCY MANAGEMENT<br>SOLUTIONS, INC.,<br><br>                              Defendant. | Case No.<br><br><br>**NOTICE OF REMOVAL PURSUANT<br>TO  28 U.S.C. §§ 1441 AND 1446<br>BY DEFENDANT BANKRUPTCY<br>MANAGEMENT SOLUTIONS, INC.** |

## NOTICE OF REMOVAL

Defendant Bankruptcy Management Solutions, Inc. ("BMS"), by and through its

undersigned counsel, and pursuant to 28 U.S.C. §§ 1441 and 1446, hereby removes the

above-entitled action, which is currently pending in the Circuit Court of Cook County,

Illinois, County Department, Law Division, State of Illinois, and states as follows:

### Background

1.      On or about July 13, 2017, Plaintiff McGarry & McGarry, LLC,

("Plaintiff") filed the action entitled *McGarry & McGarry, LLC v. Bankruptcy*

*Management Solutions, Inc.,* Case No. 2017L007010, in the Circuit Court of Cook

County, County Department, Law Division, State of Illinois, against BMS.  On that same

date, Plaintiff notified Dorsey & Whitney LLP ("Dorsey") of the filing and provided a

copy of the Complaint, Summons, and Demand for Jury Trial. *See* Exhibits A, B, and C,

respectively.  Dorsey served as counsel for BMS in a previous matter in this Court arising

from the same underlying facts. Dorsey has now been engaged to represent BMS in this matter as well.

2.     The Complaint asserts a single claim against BMS for an alleged violation of Illinois' state antitrust statute, 740 ILSC 10/3. *See* Exhibit A ¶¶ 56-58.

3.     On or about July 18, 2017, Plaintiff served BMS with a copy of the Complaint, Summons, and Demand for Jury Trial.

4.     The Complaint, Summons, and Demand for Jury Trial constitute "all process, pleadings, and orders served upon" BMS in this action to date. 28 U.S.C. § 1446(a). *See* Exhibits A, B and C.

### Timeliness of Removal

5.     Dorsey received a copy of the initial pleadings in this action, which Dorsey provided to BMS. Consequently, BMS received a copy of the Complaint no earlier than July 13, 2017. Therefore, this Notice of Removal is timely under 28 U.S.C. § 1446(b) because fewer than 30 days have passed since the earliest date on which BMS received or could have received a copy of the Complaint.

### Removal Jurisdiction

6.     This action is properly removable under 28 U.S.C. § 1441 because this Court has original jurisdiction of this case under the diversity jurisdiction provisions of 28 U.S.C. § 1332. That section provides in pertinent part: "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States . . . ." 28 U.S.C. § 1332(a).

7.     <u>Diversity</u>.  This action is between "citizens of different States."  28 U.S.C. § 1332(a)(1).  The Complaint correctly alleges that BMS "is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Irvine, California."  Exhibit A ¶ 5.  Plaintiff alleges that it "is a law firm with its place of business in Chicago, Illinois."  Exhibit A ¶ 10.  As a limited liability company, its citizenship is determined by the citizenship of its members.  Plaintiff's website identifies three "principal" attorneys who, on information and belief, are the only members of the Plaintiff LLC:

- *Annette M. McGarry.*  On information and belief, Ms. McGarry lives in the Chicago metropolitan area and is a citizen of the State of Illinois.

- *Marianne C. Holzhall.*  On information and belief, Ms. Holzhall lives in Wilmette, Illinois and is a citizen of the State of Illinois.

- *John T. McGarry, Sr.*  On information and belief, Mr. McGarry lives in Oak Brook, Illinois and is a citizen of the State of Illinois.

8.     <u>Amount in Controversy</u>.  The amount in controversy as of the date that the Complaint was filed is in excess of $75,000.  To begin with, Plaintiff's Complaint alleges that "[t]he amount in controversy under 740 ILCS 10/3 exceeds $30,000," Exhibit A ¶ 2; that Plaintiff "is entitled to recover treble damages and reasonable attorneys' fees," *id.* ¶ 95; and that Plaintiff's "reasonable attorneys' fees currently exceed $30,000, *id.*  In a telephone conversation with BMS's counsel Jonathan M. Herman on July 19, 2017, Plaintiff's counsel William Dunnegan made clear that the amount currently claimed exceeds $75,000.  He stated that Plaintiff has already incurred, and will seek to recover in this action, "several hundred thousand dollars" in attorneys' fees.  Mr. Herman requested

documentation to support this claim, but Plaintiff's counsel declined to provide it. *See* Herman Affidavit ¶ 6, submitted as Exhibit D hereto.[1] Accordingly, the total amount in controversy as of the date that the Complaint was filed exceeds the $75,000 jurisdictional minimum set forth in 28 U.S.C. § 1332(a).

9.     Therefore, this is a civil action where there is complete diversity of citizenship and the amount in controversy (excluding interest and costs), exceeds the sum of $75,000. Removal is therefore permitted under 28 U.S.C. §§ 1441, 1446.

10.     Removal to this Court is proper because the United States District Court for the Northern District of Illinois embraces the Circuit Court of Cook County, where the state court action was filed.

### Notice to State Court and Plaintiff

11.     Pursuant to 28 U.S.C. § 1446(d), BMS is promptly providing written notice of this removal to Plaintiff and will immediately file a copy of this Notice of Removal with the Clerk of the Court for the Circuit Court of Cook County, County Department, Law Division.

WHEREFORE, Defendant Bankruptcy Management Solutions, Inc. respectfully requests that the above-entitled action be removed from the Circuit Court of Cook County, County Department, Law Division to this Court.

---

[1] During the same July 19, 2017 telephone conversation, Mr. Dunnegan agreed to extend BMS's time to move against or answer the Complaint until September 18, 2017. *See* Herman Aff., ¶5.

Dated:  August 8, 2017

/s/ Michael I. Leonard

Michael I. Leonard
Mleonard@leonardmeyerllp.com
LEONARDMEYER LLP
120 North LaSalle Street, 20th Floor
Chicago, IL 60602
Tel.: (312) 380-6559
Fax: (312) 264-0671


/s/ Jonathan M. Herman

Jonathan M. Herman
(*pro hac vice* application pending)
herman.jonathan@dorsey.com
DORSEY & WHITNEY LLP
51 West 52nd Street
New York, NY 10019
Tel.: (212) 415-9200
Fax: (646) 607-0943


/s/ Michael A. Lindsay

Michael A. Lindsay
(*pro hac vice* application pending)
lindsay.michael@dorsey.com
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
Tel.: (612) 340-7819
Fax: (952) 516-5637


*Attorneys for Defendant*
*Bankruptcy Management Solutions, Inc.*

To:  Marianne C. Holzhall
     MCGARRY & MCGARRY, LLC
     120 North LaSalle Street, Suite 1100
     Chicago, IL 60602
     (312) 345-4600

     William Dunnegan
     DUNNEGAN & SCILEPPI LLC
     350 Fifth Avenue
     New York, NY 10118
     (212) 332-8300

5

# Exhibit A

#61677

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

MCGARRY & MCGARRY, LLC,          )
                                 )
                    Plaintiff,   )          2017L007010
                                 )          CALENDAR/ROOM Y
         v.                      )   Case No. TIME 00:00
                                 )          Statutory Action
BANKRUPTCY MANAGEMENT            )
SOLUTIONS, INC.,                 )
                                 )
                    Defendant.   )

COMPLAINT FOR DAMAGES

Plaintiff McGarry & McGarry, LLC ("McGarry"), by its undersigned attorney for its

complaint against defendant Bankruptcy Management Solutions, Inc. ("BMS"), alleges:

### Nature of this Action

1.      McGarry is bringing this action because BMS has orchestrated a

conspiracy with its two largest competitors, in violation of the Illinois Antitrust Act, 740

ILCS 10/3, to fix the manner of charging Chapter 7 bankruptcy estates for support

services.  Through this conspiracy, that one Trustee has termed "a train robbery," BMS

has unlawfully extracted excessive, if not exorbitant, fees from Chapter 7 bankruptcy

estates, and cheated creditors, such as McGarry, out of millions of dollars.

### Jurisdiction and Venue

2.      The Circuit Court of Cook County has jurisdiction over the claim pursuant

to 740 ILCS 10/7(2). The amount in controversy under 740 ILCS 10/3 exceeds $30,000.

3.      Venue is proper in this County pursuant to 735 ILCS 5/2-101 because the

claim in this action arises from a transaction that took place in this County.

4.    This Court has personal jurisdiction over BMS pursuant to 735 ILCS 5/2-209 because the claim arises out of BMS's transaction of business in this State.

### The Parties and the Principal Actors

5.    BMS is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Irvine, California. BMS is the largest provider of bankruptcy support services in the United States.

6.    Epiq Systems, Inc. ("Epiq") is a corporation organized and existing under the laws of the State of Missouri, with its principal place of business in Kansas City, Kansas. Epiq is the largest competitor of BMS in the national market for bankruptcy support services.

7.    TrusteSolutions is a division of Financial Software Solutions, LLC ("TrusteSolutions"), a limited liability company organized and existing under the laws of the State of Texas, with its principal place of business in Houston, Texas. TrusteSolutions is a smaller competitor of BMS in the national market for bankruptcy support services.

8.    Rabobank is a banking corporation organized under the laws of the United States. Rabobank is, and since about November 2012 has been, the bank in which BMS has required Trustees using BMS bankruptcy support services to deposit all, or substantially all, of the funds of the estates that they administer.

9.    Eugene Crane ("Crane") is a member of the Panel of Chapter 7 Trustees in the Northern District of Illinois. As a Trustee, Crane entered into contracts with both BMS and Rabobank.

10.    McGarry is a law firm with its place of business in Chicago, Illinois.

2

## Background of this Action

A.      Chapter 7 of the Bankruptcy Code

11.      The filing of a petition under Chapter 7 of the Bankruptcy Code creates an estate.  The estate, in general terms, consists of the property of the debtor at the time of the filing of the petition.

12.      Upon the filing of such a petition, the Office of the United States Trustee, a Division of the United States Department of Justice ("U.S. Trustee"), appoints a Trustee to administer the estate.

13.      The principal duty of the Trustee is to collect and liquidate property of the estate and to distribute the proceeds to creditors.  The Trustee is a fiduciary charged with protecting the interests of the various parties in the estate.  The Trustee also has a duty to make certain reports concerning the estate to the U.S. Trustee and to the Bankruptcy Court.

B.      The National Market for Bankruptcy Support Services

14.      Upon information and belief, since 1987, BMS has provided bankruptcy support services, including software, to assist Trustees in meeting their reporting and other obligations.  Upon information and belief, BMS began its operations as a spin-off of a bank that had previously provided free bankruptcy software to Trustees in exchange for their deposits of estate funds at the bank.

15.      Upon information and belief, BMS developed the software to assist Trustees in meeting their reporting and other obligations.  Upon information and belief, BMS secured copyright protection in this software, exercised reasonable precautions to insure the confidentiality of the source code for the software, and updated the software

3

over time. Upon information and belief, the competitors of BMS have developed and maintained comparable software.

16. BMS has acquired market power – meaning the power to control prices – in the market for selling bankruptcy support services to Trustees. The standard contract between BMS and a Trustee allows BMS to set its fee, in BMS's discretion, at any amount permitted by law. That standard contract of BMS with a Trustee provides:

> "As permitted by law or your applicable regulatory authority, BMS, Bank or Financial Institution shall have the right to charge your account with a service fee via ACH debit or otherwise. **Such fee shall be determined by BMS in its sole discretion**, provided however, such fee shall in no case exceed the maximum service fee permitted by law or your applicable regulatory authority and shall be debited to your account(s) on a monthly basis for the preceding month." (Emphasis added.)

17. BMS has limited competition in the national market for bankruptcy support services. Upon information and belief, as measured by the number of Trustees in the United States, BMS has more than a 50 percent share, Epiq has about a 35 percent share and TrusteSolutions has about a 15 percent share of the national market for bankruptcy support services. Upon information and belief, Trustees do not, at any one time, use more than one provider of bankruptcy support services.

18. BMS requires its Trustees to deposit the funds of the estates they administer using BMS bankruptcy support services at a designated bank. Upon information and belief, at all relevant times in or before about November 2012, BMS required its Trustees to deposit funds of the estates they administered using BMS support services at Bank of New York Mellon. Upon information and belief, at all relevant times after about November 2012, BMS required its Trustees to deposit funds of the estates that they administered using BMS bankruptcy support services at

4

Rabobank. Upon information and belief, Rabobank now holds all of the funds of the estates of each Trustee that uses BMS bankruptcy support services to administer an estate. Upon information and belief, Rabobank currently holds about $2,000,000,000 in deposits from Trustees who contract with BMS.

C.     The Manner of Charging Fees for Bankruptcy Support
       Services Based upon the Amount of Money in the Estate

19.     Prior to the financial crisis beginning in 2008, BMS did not charge fees directly to an estate. Rather, BMS would direct the estate to deposit its funds in a selected bank. The bank would earn money from the deposits of the estate, and, upon information and belief, the bank would pay BMS a fee. The bank would then pay interest to the estate.

20.     As a result of the financial crisis, interest rates declined. As a result of this decline in interest rates, the amount of money that the bank could earn from the deposits of the estates also declined, as did the bank's ability to pay BMS a fee.

21.     Before November 2010, to increase its profits without providing any additional services, BMS considered the idea of directly charging estates a fee for bankruptcy support services.

22.     Upon information and belief, BMS considered charging that fee to estates in different ways, including (a) on a per Trustee basis, (b) on a per case basis, and (c) on a per transaction basis, such as per report generated. BMS, however, never charged a fee to an estate in any of these ways.

23.     Before January 2011, upon information and belief, BMS considered a non-traditional method of setting its fee. Specifically, BMS considered selling bankruptcy support services only in combination with bankruptcy banking services and directly

5

charging estates a fee for those combined services based upon a percentage of the money in the bank account of the estate.

24.     Upon information and belief, BMS preferred this non-traditional manner of charging fees over the other methods it had identified. This non-traditional manner of charging the fee would not allow estates to determine the extent to which BMS, as opposed to its bank, received the fee. This non-traditional manner of charging the fee would also make it more difficult for the estates to determine whether the fee for bankruptcy support services was modest, reasonable, or excessive.

25.     Upon information and belief, BMS understood that the marketplace would accept this non-traditional manner of charging fees if, and only if, the three major providers of bankruptcy support services -- BMS, Epiq and TrusteSolutions -- did not charge for bankruptcy support services separately from the bankruptcy banking services.

D.      The Conspiracy to Fix the Manner of Charging Fees

26.     Before November 26, 2010, BMS proposed to Epiq and, upon information and belief, to TrusteSolutions that they, *inter alia*, sell bankruptcy support services only in combination with bankruptcy banking services, and charge no fee to an estate for those combined services other than a percentage of the amount in the bank account of the estate.

27.     Before November 26, 2010, Epiq and, upon information and belief, TrusteSolutions each accepted this proposal of BMS, as detailed below.

6

E.    The Change in the Rules to Allow Banks to Charge Direct Fees

28.    Before November 26, 2010, BMS understood that although the

Bankruptcy Court had authority to approve actual and necessary administrative

expenses, charging an estate a fee for combined services could violate the rule of the

U.S. Trustee that prohibited Trustees from paying bank fees from estate accounts.

29.    BMS, Epiq and TrusteSolutions requested that the U.S. Trustee suspend

that rule, and allow Trustees to pay bank fees from Estate accounts.

30.    On or about November 26, 2010, BMS submitted a document to the

Executive Offices of the U.S. Trustee, a copy of which is annexed as Exhibit A (the

"BMS Document"), that provided in applicable part:

> "**In several conversations with various participant banks, a number of**
> **options have been discussed.  Satisfying all of the conditions presented**
> **above , however, left a single structural option**.  Although the numbers vary
> slightly for each bank, the structure is constant with two key components:
>
>         First, since estates do not currently pay for services (banking and
> software) through a reduction in their interest income, **have them continue to**
> **pay for these services via a service fee, as a of average deposit balance**
> **assessed monthly on each account.**
>
>         Second, while there would be a base service fee percentage the actual
> percentage applied would vary reflecting changes, hopefully improvements, in
> the interest rate market by being tied to the Effective Federal Funds rate.  As the
> Effective Federal Funds Rate increases, the service fee would be reduced,
> eventually disappearing as bank interest rates increase.
>
>         **Having determined a structural solution**, the principal remaining
> question of each bank was 'what do you need to financially continue to
> participate in the Chapter 7 process including your expenses for administration
> and to fund your current software providers?'"

31.    Epiq received a copy of the BMS Document on or shortly after November

26, 2010.  In a document dated January 14, 2011, a copy of which is annexed as

Exhibit B (the "Epiq Document"), Epiq stated with respect to the proposal contained in the BMS Document:

> "This structure would promote future stability for Trustees activities, and it features well reasoned characteristics: ....
>
> • The fee is assessed uniformly to all estate accounts....
>
> • The fee is earmarked to support the technology and case management services on which trustees rely for the orderly administration of their estates, and it is not a windfall for any market participant."

32.     Epiq transmitted the Epiq Document to the U.S. Trustee on or about January 18, 2011.

33.     TrusteSolutions, through one of its affiliated banks, made this same request to allow a fee to the U.S. Trustee on or about January 21, 2011, a copy of which is annexed as Exhibit C (the "TrusteSolutions Document").

34.     On or about April 29, 2011, the U.S. Trustee suspended its rule prohibiting Trustees from paying bank service fees from estate accounts. The U.S. Trustee did not approve any amount or rate for a bankruptcy banking service fee or bankruptcy support service fee, and did not approve any manner of charging either of those fees.

F.     Execution of the Conspiracy to Fix the Manner of Charging Estates

35.     After the U.S. Trustee suspended its rule prohibiting Trustees from paying bank fees from estate accounts, BMS, Epic and TrusteSolutions reaffirmed their conspiracy described above.

36.     After April 29, 2011, BMS, Epic, and TrusteSolutions acted on their conspiracy to sell estates bankruptcy support services only in combination with

bankruptcy banking services, and to charge no fee to an estate for those combined services other than a percentage of the amount in the bank account of the estate.

37.     After April 29, 2011, BMS and its selected bank entered into agreements with Trustees that required an estate to pay a combined fee for bankruptcy support services and bankruptcy banking services based upon a percentage of the money in the account of the estate.

38.     After April 29, 2011, BMS and its selected bank then began deducting as a fee for those combined services a percentage of the money in the bank account of the estate.

39.     Upon information and belief, after April 29, 2011, neither BMS, Epiq nor TrusteSolutions has consistently charged a fee for bankruptcy support services (a) on a per trustee basis, (b) on a per case basis, or (c) on a per transaction basis, such as per report generated.

40.     Upon information and belief, pursuant to its conspiracy with Epiq and TrusteSolutions, BMS continues to sell bankruptcy support services only in combination with bankruptcy banking services, and charges the estate no fee for those combined services other than a percentage of the amount in the bank account of the estate. Currently, with certain later developed minimums, BMS and Rabobank charge fees at the rate of 1.75 percent, Epiq and its banks charge fees at the rate of 1.75 percent, and TrusteSolutions and its banks charge fees at the rate of 1.9 percent, of the amount in the bank account of an estate.

9

G.    The Contracts of BMS and Rabobank with Eugene Crane

41.    Upon information and belief, on or before April 15, 2014, BMS entered into a contract with Crane.

42.    Upon information and belief, under Crane's contract with BMS, Crane promised (i) to deposit with Rabobank all, or substantially all, of the funds of any bankruptcy estate for which he used the support services of BMS, and (ii) to allow Rabobank to automatically withdraw, without any approval of the Bankruptcy Court or notice to creditors, a monthly fee from his estate accounts at Rabobank.

43.    Upon information and belief, Rabobank thereafter entered into a contract with Crane.

44.    Upon information and belief, Crane's contract with Rabobank authorized Rabobank to automatically withdraw, without any approval of the Bankruptcy Court or notice to creditors, a monthly fee from the estate accounts.

45.    The contracts that Crane entered into with BMS and Rabobank applied to his subsequent appointments as a Trustee, even for estates that did not exist at the time of the execution of the contracts with BMS and Rabobank.

H.    The Chapter 7 Petition of Integrated Genomics, Inc.

46.    On May 4, 2011, Integrated Genomics, Inc. ("Integrated") filed in the Bankruptcy Court for the Northern District of Illinois, as case no. 11-19086, a petition under Chapter 7 of the Bankruptcy Code.

47.    Upon the filing of the petition of Integrated, the U.S. Trustee appointed Crane as the Chapter 7 Trustee of the Integrated Estate.

10

48.     On or before March 24, 2014, Crane deposited the funds of the Integrated Estate at Rabobank.

49.     Prior to the closing of the Integrated bankruptcy case, Rabobank deducted $514.16 from this account. Rabobank never paid any interest on the funds in the account of the Integrated Estate.

50.     McGarry, an unsecured creditor of Crane, received $12,472.55 on its $78,308.94 claim in connection with the distribution of the funds of the Integrated Estate.

51.     Crane filed his final account and distribution report on April 14, 2014, thereby closing the case and ending the Integrated Estate.

52.     McGarry thereafter learned that Rabobank had deducted $514.16 from the Integrated Estate's account as a fee.

53.     Upon information and belief, Rabobank paid all of these amounts to BMS pursuant to their contract.

54.     Neither Rabobank nor BMS had any permission from the Bankruptcy Court to withdraw any funds from the Integrated Estate to pay either Rabobank or BMS.

55.     The amount that Rabobank deducted in fees, and upon information and belief, paid to BMS was greater than the amount of the fees that would have resulted in the absence of a conspiracy involving BMS to fix the manner of charging estates a combined fee for bankruptcy support services and bankruptcy banking services based upon a percentage of the funds in the estate. Absent the overcharge of BMS resulting from the conspiracy to fix the manner in which BMS charge estates for bankruptcy

support services, McGarry would have received a greater distribution from the Integrated Estate.

## A CLAIM FOR DAMAGES
### (740 ILSC 10/3 -- Horizontal Conspiracy to Fix the Manner of Charging Fees)

56.     McGarry repeats the allegations in paragraphs 1 to 55 above with the same force and effect as if set forth in full.

A.    Violation of 740 ILSC 10/3.

57.     BMS, Epiq and, upon information and belief, TrusteSolutions conspired to sell estates bankruptcy support services only in combination with bankruptcy banking services, and to charge estates no fee for those combined services other than a percentage of the amount in the bank account of the estate.

58.     This conspiracy constitutes a violation of 740 ILSC 10/3(1) or, alternatively, 740 ILSC 10/3(2).

I.    Direct Evidence of a Conspiracy

59.     The allegation that BMS conspired with Epiq and, upon information and belief, TrusteSolutions to fix the manner of charging for combined services based upon the amount of money in the bank account of the estate, rests in part upon the following facts that directly support the finding that these parties entered into this conspiracy.

60.     On or before November 26, 2010, upon information and belief, BMS, Epiq and TrusteSolutions, communicated directly about selling bankruptcy support services only in combination with bankruptcy banking services, and charging no fee to an estate for those combined services other than a percentage of the amount in the bank account of the estate.

12

61.     On or about November 26, 2010, BMS submitted the BMS Document to the Executive Offices of the U.S. Trustee.  The BMS Document confirmed that a conspiracy had already occurred.  The BMS Document provided in applicable part:

> "**In several conversations with various participant banks, a number of options have been discussed.  Satisfying all of the conditions presented above , however, left a single structural option**.  Although the numbers vary slightly for each bank, the structure is constant with two key components:
>
>     First, since estates do not currently pay for services (banking and software) through a reduction in their interest income, **have them continue to pay for these services via a service fee, as a of average deposit balance assessed monthly on each account**.
>
>     Second, while there would be a base service fee percentage the actual percentage applied would vary reflecting changes, hopefully improvements, in the interest rate market by being tied to the Effective Federal Funds rate.  As the Effective Federal Funds Rate increases, the service fee would be reduced, eventually disappearing as bank interest rates increase.
>
>     **Having determined a structural solution**, the principal remaining question of each bank was 'what do you need to financially continue to participate in the Chapter 7 process including your expenses for administration and to fund your current software providers?'" (Emphasis added.)

62.     BMS engaged in a horizontal conspiracy to fix the manner of selling and charging for combined bankruptcy support services and bankruptcy banking services. The November 26, 2010, BMS Document demonstrates that (i) BMS had conversations with various banks participating in the Chapter 7 program, which necessarily included joint venturers of BMS's horizontal competitors, and (ii) BMS reached an agreement with at least one of those banks, and therefore one of BMS's horizontal competitors, to fix the manner of selling and charging for combined bankruptcy support services and bankruptcy banking services.

63.     Epiq saw the BMS Document on or shortly after November 26, 2010, and agreed with the substance of it.

13

64.     On or about January 13, 2011, Epiq responded to the proposal of BMS by preparing a document entitled "Chapter 7 Industry Comments." In that document, Epiq stated in part:

> "**Epiq Systems' Comments on Proposal by BMS/Bank of NY Mellon**
>
> [Content redacted by U.S. Trustee pursuant to 5 U.S.C. § 552(b)(4)] **This structure would promote future stability for trustee' activities, and it features well reasoned characters**:
>
> - the amount of the fee moves automatically with changes to market interest rates
> - **the fee is assessed uniformly to all estate accounts**
> - the fee extinguishes itself automatically in normal interest rate environments
> - **the fee is earmarked to support the technology and case management services** on which trustees rely for the orderly administration of their estates, and it is not a windfall for any market participant
>
> [Content redacted by U.S. Trustee pursuant to 5 U.S.C. § 552(b)(4)]
> (b)(4)
>
> **Epiq Systems' Proposal**
>
> [Content redacted by U.S. Trustee pursuant to 5 U.S.C. § 552(b)(4)]
>
> While this approach would not solve the problems that collateralized deposits on banks' balance sheets, it would nevertheless avoid the pending disruption to estate administration that we believe may otherwise occur." (Emphasis added.)

65.     Upon information and belief, TrusteSolutions saw the BMS Document on or shortly after November 26, 2010, and agreed with the substance of it.

66.     On January 21, 2011, Texas Capital Bank, on behalf of itself and TrusteSolutions, proposed to the U.S. Trustee that estates be charged for combined bankruptcy support services and bankruptcy banking services based upon a percentage of the amount of money in the estate. Texas Capital Bank stated:

14

"Due to the current interest rate environment financial institutions are able to secure deposits at virtually no operational cost. The current UST program requires a high level of operational support, including banking support, software support and hardware support to bankruptcy trustees to remain in compliance with the UST requirements to administer bankruptcy estates that cannot be offset solely by the value of deposits maintained. **Therefore TCB will need to assess to the bankruptcy estates a monthly Custodial Fee as a percentage of balances maintained to offset the operational support provided**. Depending on the level of operational support required and the interest rate environment TCB will annually adjust the Custodial Fee accordingly." ("Emphasis added.")

67.     Upon information and belief, Texas Capital Bank, acting on behalf of itself and/or TrusteSolutions, communicated this position to BMS and Epiq either directly or indirectly.

II.     Circumstantial Evidence of a Conspiracy

Structure of the National Market for Bankruptcy Support Services

68.     The structure of the national market for bankruptcy support services facilitates collusion. The services are homogeneous; the demand is inelastic; the prices charged to estates for the services can be determined from publicly filed reports of Trustees; barriers to entry exist because of the software; and the number of competitors is small.

Communications Between the Three Firms

69.     Upon information and belief, representatives of BMS, Epiq and TrusteSolutions are, and at all relevant times have been, in regular communication. Representatives of BMS, Epiq, and TrusteSolutions have attended conferences among Bankruptcy Judges, Trustees and attorneys. Upon information and belief, representatives of BMS, Epiq, and upon information and belief, TrusteSolutions, have attended the bankruptcy related conferences sponsored by (i) The American

15

Bankruptcy Institute, (ii) The National Conference of Bankruptcy Judges, and (iii) The National Association of Bankruptcy Trustees ("NABT").

70.     On or about July 25, 2012, the Chief Executive Officer of BMS, Steve Coffey ("Coffey"), and a representative of Epiq, Scott Field, Esq. ("Field"), appeared before the United States Bankruptcy Court for the Northern District of Ohio, in *In re Bradley & Michelle Dorfler, et al.*, Case No. 10-51411 (MSS) (Bnky. N.D. Oh.), to defend the fees of BMS. The following ensued:

> "THE COURT: Okay. Mr. Coffey, you heard me – I'll make sure your counsel doesn't mind my asking you questions directly. You know, if I'm asking – if I start to veer into any trade secrets or confidential information, then simply say so.
>
> MR. COFFEY: I don't think there will be a problem. Mr. Field is in the room and **I don't think we had a lot of secrets between us so that's fine**." (Emphasis added.)

<u>Announcement of Non-Price Competition</u>

71.     Upon information and belief, BMS, Epiq and TrusteSolutions do not compete based upon price. In repeated filings with the Securities and Exchange Commission, Epiq disclosed that it did not compete in the market for bankruptcy support services based upon price. For example, in its Form 10K filed February 25, 2011, Epiq represented that it did not compete in the market for bankruptcy support services based upon price, stating:

> "**<u>eDiscovery</u>**
>
> The e-discovery market is highly fragmented, intensely competitive and rapidly evolving. Competitors include Electronic Evidence Discovery, Inc., Fios, Inc., Kroll Ontrack (Altegrity Inc.), Attenex (FTI Consulting, Inc.), Autonomy ZANTAZ, Inc., Stratify, Inc. (Iron Mountain Incorporated), and Clearwell Systems, Inc. **Competition is primarily based on the quality of service, technology innovations, and price**.

**Bankruptcy**

Our bankruptcy segment competes in a more mature market. We are one of two primary providers in the Chapter 7 bankruptcy market, along with Bankruptcy Management Solutions, Inc.; and in the Chapter 11 bankruptcy market competitors include Kurtzman Carson Consultants LLC and The Garden City Group, Inc. In both the Chapter 7 and Chapter 11 markets there are also several smaller competitors. **Competition is primarily based on quality of service and technology innovations**. Competitors for our AACER® product include American InfoSource and LexisNexis® Banko® Solutions.

**Settlement Administration**

The primary competitors with our settlement administration segment are The Garden City Group, Inc., Rust Consulting, Inc., and Gilardi & Co LLC, as well as several smaller competitors. **Competition is primarily based on the quality of service, technology innovations, and price**." (Emphasis added.)

72.     Shortly after the decision of the U.S. Trustee to allow Trustees to pay service fees from estate accounts, BMS publicly announced that it would not negotiate concerning fees with Trustees. BMS stated in a document that it publicly distributed in or about June 2011:

**"Is the Service Fee Negotiable?**

A. No. In order to provide equal treatment in all bankruptcy cases, the Services Fee is based on a uniform rate as set forth above and is a condition of participation in the BMS program."

73.     Upon information and belief, BMS, Epiq and TrusteSolutions have refused to negotiate concerning fees with Trustees, with the exception of the limited discussions involving a small group of Trustees in this State in or about late 2011, described below.

74.     BMS has publicly encouraged Epiq and TrusteSolutions to refuse to submit their fees to the Bankruptcy Court for approval on a per case basis. In *In re Nanodynamics, Inc.*, Case No. 09-13438 (MJK) (W.D.N.Y.), Coffey of BMS testified in a declaration dated and filed September 12, 2011:

17

"20. Finally, I would like to address another issue that was raised at the August 31, 2011 hearing with regard to the pricing for BMS Services. At the hearing, the Court noted that:

> 'I do feel that the business model, pricing, in light of what you said, that's not based on monthly activity, it's not based on the burdens upon the service providers, it's based simply upon how many dollars are in an account . . . .'

[Transcript, 30:21- 31:2].

21.     The Court's observation is essentially correct, but that should not affect the allowance of the BMS Service Fee as an administrative expense, for at least three reasons…. Where, as here, the trustee in the exercise of his discretion has determined that the foregoing requirements are satisfied, I am not aware of anything that requires that a claim be measured by any particular method, such as the (a) cost to the provider of providing the service; (b) the amount of the service actually used by the estate each day; or (c) the price at which a competitor might be willing to offer a similar product, albeit with a lower quality of service. If it were otherwise, then administrative expenses for things like a trustee's compensation under section 326(a), the UST's quarterly fees, or even the rent paid by a trustee for a facility to store estate property, would all be subject to retrospective revaluation on an individual case basis. **I would submit that under such a regime, few, if any, parties would be willing to do business with a chapter 7 trustee; BMS and BNY Mellon certainly would not**.

22.     Second, the BMS 'flat' percentage fee structure exists for a reason, much like the rate structures for trustee compensation, UST quarterly fees, and, say monthly premises rent, are 'flat fee' based, rather than being based [on] use or activity levels. The reason is that no other structure is administratively feasible. BMS and BNY Mellon do business with hundreds of trustees across the nation, who collectively handle more than 50,000 'asset' cases currently (in addition to hundreds of thousands of 'no asset' cases annually), it would be utterly impractical for BMS and BNY Mellon to negotiate hundreds, or thousands, of 'one-off deals' with individual trustees, based on the facts and circumstances of each case; the costs of evaluating, negotiating and monitoring so many unique contracts would by themselves be prohibitive, to both the trustees and to BMS and BNY Mellon. **While the trustee services business may, if this interest rate environment continues, ultimately evolve to a different model, where pricing is based on a set schedule of fees and charges for numbers and types of transactions, at this point, that is simply not a business model that BMS and BNY Mellon are prepared to offer. When and if any other providers are willing to offer services under such a model, trustees of course have the ability to terminate their arrangements with BMS and BNY Mellon on 30 days notice, and to contract with such providers**, to the extent

18

that the trustees believe that they should do so in accordance with the exercise of their fiduciary duties." (Emphasis added.)

75.     On or about January 12, 2016, Jill Bauer, Managing Director of Trustee and Fiduciary Services for Epiq, executed a declaration that BMS filed in *In re On-Site Sourcing, Inc.*, Case No. 09-10816 (RGM) (Bnky. E.D. Va.), that confirmed that bankruptcy support service providers competed only in terms of market share and not in terms of the manner of charging fees, stating in part:

> "I also agree that compensation issues challenging our industry have necessitated service providers to transition to alternative pricing models while also actively and aggressively competing with one another to capture market share."

### Refusing to Charge Separately Despite Pressure from Bankruptcy Courts

76.     BMS, Epiq and TrusteSolutions continued to sell estates only combined bankruptcy support services and bankruptcy banking services, despite the pressure from certain Bankruptcy Courts to sell and charge for bankruptcy support services separately.

77.     Beginning in the summer of 2011, Bankruptcy Courts in at least four districts throughout the United States addressed the issue of whether Trustees should pay combined fees for bankruptcy support services and bankruptcy banking services from estate accounts.

78.     In *In re Canopy*, Case No. 09-44943 (ERW) (Bnky. N.D. Ill.), the Bankruptcy Court's transcript of November 8, 2011, provided the following exchange between the Bankruptcy Court and Trustee Gus Paloian ("Paloian"), concerning the need to charge separately for, or unbundle, the bankruptcy support services and bankruptcy banking services:

19

"MR. PALOIAN: And so what we face now are the bundled services of Epic plus a bank.

THE COURT: Okay. **I think what we need is to unbundle it**.

MR. PALOIAN: Yeah, exactly, Judge. I couldn't agree more. I've tried to do this. I've had these discussions. We're not necessarily at the point. I have not been able to get a direct quote for just trustee/Epic software services." (Emphasis added.)

79.    To date, upon information and belief, Paloian still has not obtained bankruptcy support services apart from bankruptcy banking services from BMS, Epiq or TrusteSolutions.

<u>Withdrawal of Services in the Western District of New York</u>

80.    On September 7, 2011, the Bankruptcy Court for the Western District of New York entered a standing order that vacated its prior order of June 7, 2011. The June 7, 2011, order had given blanket approval for the payment of a combined fee for bankruptcy support services and bankruptcy banking services. The September 7, 2011, order provided that charges for bankruptcy support services would be determined on a per case basis under 11 U.S.C. § 328, or any other applicable statute.

81.    On October 31, 2011, BMS announced that it would withdraw, and later withdrew, from providing bankruptcy support services to Trustees located in the Western District of New York. Upon information and belief, BMS did not attempt before withdrawing from that District to charge for its bankruptcy support services apart from bankruptcy banking services, or to seek approval for its fees in the manner that 11 U.S.C. § 328 provides.

82.    If BMS had provided bankruptcy support services to Trustees in the Western District of New York, and sought approval of its fees as an administrative

20

expense as 11 U.S.C. § 328 provides, BMS would have earned revenue from cases

pending in the Western District of New York. Rather than provide bankruptcy support

services, seek compensation for those services pursuant to 11 U.S.C. § 328, and earn

revenue from bankruptcy cases pending in the Western District of New York, BMS

refused to provide those services in the Western District of New York. The decision of

BMS to refuse to provide those services in the Western District of New York in these

circumstances would have been contrary to the economic interests of BMS, but for its

conspiracy described above.

83.     Upon information and belief, since January 2011, neither BMS, Epiq, nor

TrusteSolutions has charged separately for bankruptcy support services.

Excessive Prices

84.     Upon information and belief, BMS charged prices greater than the prices

that it would have been able to charge absent the unlawful conspiracy.

85.     Trustees have stated that the amounts that bankruptcy service providers

charge are excessive.

86.     On or about February 16, 2011, a liaison committee of the NABT

represented in substance to the U.S. Trustee that a fee based upon an annual rate of

3% of the money in the bank account of the estate would be excessive:

> "- **A 3% annual fee is excessive**. 3% is essentially the trustee fee on a large
> estate, which is typically earned over a number of years (assuming,
> hypothetically, three years, the bank depository fee would be 9% while the
> trustee commission for services rendered is limited to 3%).
> - Depositories would receive a windfall on multi-million dollar estates.
> - Even in small estates, where disputes (ie, appeals) result in the estate
> remaining open a number of years, the depository fee can easily dissipate 10 -
> 15% of the assets of the estate." (Emphasis added.)

21

87.     On or about August 11, 2011, a Chapter 7 Trustee from the District of

Arizona wrote to the members of the NABT:

> "Somehow it sort of feels like we are being taken to the cleaners and can't do anything about it. We have become so dependent on the software that they can charge just about anything they want and what are we to do about it. Seems to me we need a REGULATOR to handle this and in my mind it should be the US Trustee. They need to step up and prevent this monopolizing by the BIG THREE and tell them what THEY think is a reasonable charge and that should be universally. An annual fee which we can spread among the estates pro rata like we do for the bond. **This is a train robbery and our creditors are the ones that are being taken advantage of.** While we get $60 a case, The BIG THREE (Epiq, BMS and Trustees Solution [sic]) gets to make hundreds of dollars per trustee per year just for providing SOFTWARE?  Something doesn't seem equitable!" (Emphasis added.)

88.     On or about November 2, 2011, a Chapter 7 Trustee from this District

wrote to the NABT:

> "The problem is that we are looking in the wrong place for a solution.  The problem is we need software and support to keep track of our cases and do our reports. We don't need computers, printers, monitors, scanners, etc. from the software vendor.  If the former model that provided all those perks is no longer sustainable, then we need to unbundle the package and pay for that which we need, not that which we want. **The discussion should be with the software vendors to unbundle and do away with the dedicated banking relationships. There is little to recommend our continued commitment to the banks, given their reaction to the problem and their opportunistic pricing which seems far beyond anything that is reasonably tied to their costs. (I have a case with $12 million in it and I simply do not think it costs BofA $60,000 to service that case).**" (Emphasis added; original emphasis removed.)

89.     Epiq has advised the Administrative Offices of the U.S. Courts that a fee

of 0.50% to 0.75% would be reasonable except in unique situations.  In a memorandum

to the Administrative Offices of the U.S. Courts, Field of Epiq wrote on April 2, 2012:

> "Banks will not enter in to this business and wait for an order in the future authorizing the fee on a case-by-case basis or possibly risk disgorgement should a court determine them unreasonable. This does not mean that the judiciary needs to authorize the fees presently being charged by banks. **The courts could**

**authorize some smaller number they feel is 'reasonable' (such as 0.50% to 0.75%) and then allow a bank to request a higher amount for unique situations**." (Emphasis added.)

B.    Standing

90.    McGarry will efficiently enforce the antitrust law. As the largest unsecured creditor of the Integrated Estate, no other person has a greater incentive and ability to enforce the antitrust law with respect to this violation.

91.    McGarry meets the constitutional requirements for standing because McGarry has sustained an injury in the form of an overcharge attributable to the violation of 740 ILSC 10/3, since BMS has eliminated competition in the manner of its pricing, that a monetary judgement in this action could remedy.

92.    McGarry meets the statutory requirements for standing because the Illinois Legislature intended that McGarry, and those similarly situated, would have a cause of action under 740 ILSC 10/3 in these circumstances. McGarry is within the zone of interests that this statute seeks to protect. The statute seeks to prevent injuries that result from the reduction of competition. McGarry sustained an injury because BMS charged excessive, if not exorbitant, fees to Chapter 7 bankruptcy estates. In addition, McGarry sustained damages as a proximate cause of the violation of the statute. No one is any closer to the damage that BMS caused than McGarry.

C.    Damages

93.    As a result of the anti-competitive activities of BMS in violation of 740 ILCS 10/3, McGarry has sustained damages to its business and property in an amount to be determined by the trier of fact in this action

94.     McGarry has not suffered any injury asserted in this action based upon any (i) conduct of the government, (ii) conduct of BMS that the government compels, or (iii) conduct of BMS in petitioning the government.

95.     McGarry is entitled to recover treble damages and reasonable attorneys' fees pursuant to 740 ILCS 10/3.  McGarry's reasonable attorneys' fees currently exceed $30,000.

WHEREFORE, McGarry, individually and on behalf of those similarly situated, demands judgment against BMS:

(a)     Awarding judgment for compensatory damages in an amount to be determined by the trier of fact in this action;

(b)     Awarding judgment for treble damages, pursuant to 740 ILCS 10/3, or otherwise;

(c)     Awarding reasonable attorneys' fees in this action, pursuant to 740 ILCS 10/3, which currently exceed $30,000;

(d)     Awarding costs pursuant to 740 ILCS 10/3;

(e)     Declaring that BMS has engaged in an unlawful conspiracy with at least one of its competitors to sell bankruptcy support services only in combination with bankruptcy banking services and to charge estates no fee for those combined services other than a percentage of the amount in the bank account of the estate; and

24

(f)     Granting such other and further relief as to the Court deems just and

proper.

Dated:  July 13, 2017

_Marianne C. Holzhall_

Marianne C. Holzhall
Atty. No. 61677
(mch@mcgarryllc.com)
120 North LaSalle Street, Suite 1100
Chicago, Illinois 60602
(312) 345-4600

Attorney for Plaintiff

Dunnegan & Scileppi LLC
350 Fifth Avenue
New York, New York 10118
(212) 332-8300,

        Of Counsel.

Verification

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that she is a member of plaintiff McGarry & McGarry, LLC and that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that she verily believes the same to be true.

Dated: July 13, 2017

Annette McGarry

# EXHIBIT A

## Bank Participation In The Chapter 7 Program
Discussion Outline

### Background

In recent years the process of administering Chapter 7 cases has become more complex causing the volume of work on the part of panel trustees, US Trustees and all of the administrative and regulatory participants to increase significantly. With this complexity the process has evolved to the point where the service providers (banks and software companies) have become an integral part of the process.

Traditionally, the contributions of the service providers have been paid for by each beneficiary Chapter 7 estate through a process whereby each estate received a rate of interest that reflected a discount from market rates in exchange for such services.

The process described above always assumed that the banks would want deposits, pay interest on those deposits and fund the software companies who in turn provide software, hardware and services to the Chapter 7 Trustees completely free of charge. Recent long-term changes in the economy and the banking environment have completely dismantled this premise.

### Issue

In today's environment Chapter 7 accounts are not profitable for the banks. In some cases, these accounts are not only unattractive financially but work against other regulatory financial requirements that have been or are anticipated to be made a part of our banking system. The net result is that Chapter 7 deposits are undesirable and capacity for such deposits is being reduced drastically.

Essentially, the current economic crisis has shifted the cost of banking and case management software from the beneficiary estates to those entities (banks and software companies) providing the services.

In response to this situation, banks are taking actions to cut their losses in this business line including: reducing interest rates, initiating collateral and administrative charges; discouraging trustee deposits; and, to the extent contractually possible, eliminating the historical "referral fees" that fund the software providers that the trustees have come to rely on for the efficient administration of their cases. These steps are being taken even to the extent that banks are significantly reducing deposit capacity and in some cases simply refusing deposits.

1

One major bank ceased its participation in the Chapter 7 Program earlier this year. At least two others have made it no secret that at the earliest opportunity they intend to withdraw their participation as well.

**Challenge**

Recognizing the banks' critical role in maintaining both the integrity of the system and the services provided to the trustees, the challenge is to find a mechanism that will cause the banks to continue to participate in the Chapter 7 process.

Given that in the current interest rate environment, the previous funding for these banking and software services no longer exists, a second part of the challenge is to determine how to provide such funding.

**Solution Concept**

In designing a program to meet this challenge there are a number of criteria that should be met as part of any solution. Among the criteria addressed in developing a response to the current situation, the key was to find a solution that:

- recognizes that the current situation is temporary (until deposit demand and interest rates increase)
- terminates automatically as conditions improve
- is formulaic and not subject to interpretation
- is tied to a federal index not subject to manipulation yet indicative of a change in the banking environment
- provides the banks with adequate compensation to remain active participants in the program
- continues the historical process of allocating the cost of the services to the estates that are the beneficiaries of those services
- is a permanent solution that will avoid having to reopen this issue should volatility in the banking world cause similar circumstance to reoccur.

**Conversations**

In several conversations with various participant banks, a number of options have been discussed. Satisfying all of the conditions presented above, however, left a single structural option. Although the numbers vary slightly for each bank, the structure is constant with two key components:

First, since estates do not currently pay for services (banking and software) through a reduction in their interest income, have them continue to pay for these services via a service fee, as a % of average deposit balance assessed monthly on each account.

2

Second, while there would be a base service fee percentage, the actual percentage applied would vary reflecting changes, hopefully improvements, in the interest rate market by being tied to the Effective Federal Funds rate. As the Effective Federal Funds rate increases, the service fee would be reduced, eventually disappearing as bank interest rates increase.

Having determined a structural solution, the principal remaining question of each bank was "what do you need financially to continue to participate in the Chapter 7 process including your expenses for administration and to fund your current software providers?"

Due to the uncertainty and varying estimates of collateral costs and several regulatory and competitive unknowns regarding payment of interest on estate accounts, in order to provide a baseline to their consideration the fee question was conditioned as independent of any collateral or interest expense. The thought was that collateral charges would be addressed separately (possibly as an additional fee on the excess deposit accounts) and that interest is currently low enough not to be a significant issue in the current consideration.

After internal review and considerable conversation, while the banks did not provide hard numbers, some consensus did surface regarding both the fee percentage and the application of the Effective Federal Funds rate as the benchmark for reducing the fee.

**Formula Detail**

Each estate would be assessed a monthly fee calculated as follows: multiply the average Deposit Balance (including deposits of all sorts such as cash and securities eligible under 11 USC 345) for the month by the difference between the Service Fee % less the average Effective Federal Funds rate (EFF) for the month then multiplying the resultant by the quotient of the number of days in the month divided by the number of days in the year.

The formula would be expected to serve as an industry floor applied evenly to all Chapter 7 accounts.

The formula would be expected to be a permanent part of the process relying on the formula itself to cause the service fee to, effectively, be temporary.

Open issues include:
- Fee Percentage: Since the banks did not provide hard numbers, an open issue is the final fee percentage. The discussions generally ranged from 3.5% to 4% with occasional consideration of 3%.

3

- Federal Funds Adjustment Threshold: The method of applying the adjustment to the fee reflecting the EFF rate also varied. Suggestions range from having the adjustment reflect EFF on an actual one-to-one basis (ex: a reduction in the fee for each bp of the EFF) with no minimum to having the one-to-one impact occur only to the extent that the EFF exceeds a floor of 200 bps.

Although not included in the base service fee, the issue of relief from collateral charges and possibly FDIC assessment charges must also be separately addressed.

**Opinion**

Based on the conversations with the banks and independent research regarding bank costs and profitability targets, it is believed that a rate as low as 3% with the fee adjustment reflecting the actual EFF (i.e. without a threshold floor) may be adequate to attract the banks to continue their full participation to include the funding of the software providers.

Collateral and interest costs should be addressed separate and apart from the base service fee, possibly on an individual bank basis.

**Suggestion**

A potential next step in this process could be for EOUST representatives to discuss the above directly with the major banks currently involved to validate both the premise that the banks do not wish to continue supporting the Chapter 7 Program under the current circumstances and the acceptability of the concept and formula noted above.

Assuming such validation, the final step prior to EOUST consideration, would be to establish a consensus regarding the base service fee percentage and the EFF adjustment threshold that encourages the banks' continued support of the Chapter 7 program.

4

# EXHIBIT B

# Chapter 7 Industry Comments

## Epiq Systems, Inc.

January 14, 2011

### Introduction

During 2010, virtually every market participant, including Epiq Systems, expressed concerns regarding the potential for significant future disruption to the orderly administration of Chapter 7 estates because of historically low interest rates and the very high cost of collateral.

Without modifications in the Chapter 7 system, the current economic climate has resulted in, and will increasingly continue to result in, an unsustainable misalignment between revenue and costs for the community of software providers and financial institutions that provide essential services to trustees:

- banks currently holding Chapter 7 deposits are reevaluating their intention in this marketplace following expiration of current commitments;
- new banks are not entering the marketplace;
- certain banks will not accept deposits requiring collateral, and certain banks will not accept *any* Chapter 7 deposits

The initial prospect of potential relief from the Dodd-Frank Wall Street Reform Act was an important, welcomed industry development. Specifically, the act anticipated 100% FDIC coverage on all non-interest bearing balances, regardless of the balance. Epiq and others appreciated action by EOUST in November 2010 to waive temporarily handbook requirements to facilitate the use of non-interest bearing accounts under Dodd-Frank.

However, the Treasury Fiscal Assistant Secretary made a decision that <u>will require collateral</u> to be pledged to protect government balances in CFR 202 and CFR 225, and the anticipated relief has accordingly <u>not occurred</u>. Absent the anticipated relief, bankruptcy deposits requiring collateral are financially unsupportable to banks, and accordingly, there is a significant risk of disruption to Chapter 7 estate administration if banks cannot both fulfill their regulatory requirements and experience a reasonable financial result from their participation in the Chapter 7 system.

Below we have set forth recommendations to avoid disruption in the Chapter 7 community, to balance the reasonable needs of all constituents, and to maintain a fair environment that promotes healthy competition. In preparing these comments, we have reviewed the remarks submitted previously by other market participants and solicited input from all financial institutions with which Epiq Systems has relationships in the Chapter 7 environment.

### Overview of Model

Administration of Chapter 7 estates is complex and requires continually evolving, sophisticated technology products and services. Market participants provide:

- advanced case management software for no-asset and asset cases with industry-specific functionality that cannot be realized in generic, off-the-shelf software

- a vast library of customized reports that are continually being updated to meet requirements in each bankruptcy court;
- electronic court filing modules that must adapt to changing and unique attributes in the 93 bankruptcy jurisdictions;
- on-site training and start-up services for both new trustees and continuing education for established trustees;
- database conversion and import of data from foreign environments;
- telephone support assisting trustees use the software products and troubleshoot issues in specific cases
- compliance reports for the EOUST and auditors

Without these services, trustees would be unable to fulfill their recordkeeping, compliance and administrative duties accurately or efficiently.

In addition, technology providers have also provided computer equipment, configuration, installation, maintenance and ongoing upgrades to trustees.

<u>Banking Environment Overview</u>

The Federal Funds Rate has been at a historically low level since 2008, and collateral costs have escalated to historic highs. The industry has nevertheless continued providing full, uninterrupted service to trustees throughout this period.

Further, the surety market on which banks relied to manage collateral requirements had completely dried up until recently. Even now, surety bonds are only available to banks featuring the strongest ratings. These banks, however, generally lack the appetite for Chapter 7 deposits in the current climate.

Considering that acceptable forms of collateral are basically limited to treasuries, Ginnie Mae's and SBA's; banks supporting Chapter 7 deposits are not only tying up money but also impairing their balance sheets at a time when balance sheet review by the Treasury Department has never been stricter. The 115% collateral threshold above FDIC insurance exacerbates these challenges.

Most banks with which we have spoken expressed interest in collateralized balances if they could explore <u>off</u> <u>balance</u> <u>sheet</u> transactions such as overnight repurchase agreements (i.e. repo's) or Federal Home Loan Bank Letters of Credit. However, until such an approval were received, the status quo is creating a heightening risk of great national disruption throughout the Chapter 7 system.

<u>Epiq Systems' Comments on Proposal by BMS / Bank of NY Mellon</u>

(b)(4)

(b)(4)                                          This structure would promote future stability for trustees' activities, and it features well reasoned characteristics:

- the amount of the fee moves automatically with changes to market interest rates
- the fee is assessed uniformly to all estate accounts
- the fee extinguishes itself automatically in normal interest rate environments
- the fee is earmarked to support the technology and case management services on which trustees rely for the orderly administration of their estates, and it is not a windfall for any market participant

(b)(4)

<u>Epiq Systems' Proposal</u>

(b)(4)

While this approach would not solve the problems that collateralized deposits create on banks' balance sheets, it would nevertheless avoid the pending disruption to estate administration that we believe may otherwise occur.

# EXHIBIT C

| | |
|---|---|
| **From:** | McKemie, John |
| **To:** | Solomon, Doreen (USTP) |
| **Cc:** | Dheeraj Singal |
| **Subject:** | Depository Support for the US Trustee Program |
| **Date:** | Friday, January 21, 2011 11:08:26 AM |
| **Attachments:** | LETTER OF UNDERSTANDING 110112.docx |

Good Day Doreen,

I was gratified to learn this week that the issue over full FDIC coverage on Trustee accounts has been resolved and we can move forward with assisting TrusteSolutions on supporting their banking requirements for the Trustee estates they are servicing. As you are aware from our prior conversations and input from Raj Singal, we are going through unprecedented times in the Banking industry with respect to both the level of deposits available and the extremely low interest rate environment we are experiencing. Looking at Fed Funds futures and researching the market projections all point to a persistently low rate environment through 2011 and well into 2012.

Given these conditions the support model that has been historically used to compensate banks for absorbing the high operational expenses associated with processing thousands of accounts is no longer viable. Our bank and TrusteSolutions have held numerous discussions since last November over how we can work together to support the US Trustee program. We view this as a relationship opportunity and wish to make a long term commitment to working closely with TrusteSolutions. We realize for that opportunity to develop it must be advantageous for both TrusteSolutions and Texas Capital Bank as well as the US Trustee program. In consideration of the timing impact to TrusteSolutions as well as for our bank to be operationally ready to support the business by June 2011, we both need to establish the parameters with which we can operate with the US Trustee office.

In that regard we have prepared an attached joint Letter of Understanding that outlines the key parameters for all of us to move forward. Given that we can have concurrence on these parameters we will immediately begin to allocate the necessary resources to provide you with an amended Depository Agreement that reflects the current economic environment we are experiencing along with committing the internal resources to work with TrusteSolutions on the transition requirements to move to Texas Capital.

Doreen, if you have any questions that you want addressed we would be open to a conference call, either separately or jointly.

Thanks for your consideration on this and we look forward to hearing from you.

John


**Please note the updated contact information.**

John E McKemie
*Senior Vice President*

Treasury & Liquidity Sales
One Riverway, Suite 2100
Houston, Texas 77056
832. (b)(6) office
832.308.7942 fax
john.mckemie@texascapitalbank.com

⊛ TEXAS CAPITAL BANK

If you are not the addressee and have received this email in error, please notify me immediately. This email is confidential and may contain privileged or proprietary information that is unlawful for you to read, copy, distribute, disclose or otherwise use in any way.

LETTER OF UNDERSTANDING

Between

TEXAS CAPITAL BANK, TRUSTESOLUTIONS and the US TRUSTEE OFFICE

Texas Capital Bank (TCB) proposes to provide depository support to TrusteSolutions and the US Trustee Office (UST) as per the following:

- The US Trustee Program Depository Agreement will be submitted with amendments to reflect the following changes:
  - TCB will open only Demand Deposit Accounts (DDA) for all Bankruptcy accounts during the period that the FDIC is providing full insurance coverage on DDA's
  - Due to full insurance coverage by the FDIC on all DDA's TCB will not pledge any collateral for amounts in excess of $250,000 and if so required will pass back to the estates any associated charges
  - Any reports required relating to collateral or interest bearing accounts will be suspended until the FDIC ends its coverage of all balances
- Due to the current interest rate environment financial institutions are able to secure deposits at virtually no operational cost. The current UST program requires a high level of operational support, including banking support, software support and hardware support to bankruptcy trustees to remain in compliance with the UST requirements to administer bankruptcy estates that cannot be offset solely by the value of deposits maintained. Therefore TCB will need to assess to the bankruptcy estates a monthly Custodial Fee as a percentage of balances maintained to offset the operational support provided. Depending on the level of operational support required and the interest rate environment TCB will annually adjust the Custodial Fee accordingly.
- TCB will commit to work closely with TrusteSolutions to offer recommendations on how to modernize the current UST model to reduce operational expenses through innovation and increased efficiency thereby reducing the overall costs associated with the existing program.

# Exhibit B

| 2120 - Served | 2121 - Served |
|---|---|
| 2220 - Not Served | 2221 - Not Served |
| 2320 - Served By Mail | 2321 - Served By Mail |
| 2420 - Served By Publication | 2421 - Served By Publication |
| Summons - Alias Summons | (01/25/17) CCG N001 |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

McGarry & McGarry, LLC

(Name all parties)

v.

Bankruptcy Management Solutions, Inc.

No. 2017L007010
CALENDAR/ROOM Y
TIME 00:00
Statutory Action

### ⊙ SUMMONS ○ ALIAS SUMMONS

To each Defendant:

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

- ☑ Richard J. Daley Center, 50 W. Washington, Room **801** , Chicago, Illinois 60602
- ☐ District 2 - Skokie
  5600 Old Orchard Rd.
  Skokie, IL 60077
- ☐ District 3 - Rolling Meadows
  2121 Euclid
  Rolling Meadows, IL 60008
- ☐ District 4 - Maywood
  1500 Maybrook Dr.
  Maywood, IL 60153
- ☐ District 5 - Bridgeview
  10220 S. 76th Ave.
  Bridgeview, IL 60455
- ☐ District 6 - Markham 16501
  S. Kedzie Pkwy. Markham,
  IL 60428
- ☐ Child Support: 50 W.
  Washington, LL-01,
  Chicago, IL 60602

You must file within 30 days after service of this Summons, not counting the day of service.

IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

☑ Atty. No.: **61677**

Name: Marianne C. Holzhall

Atty. for: Plaintiff

Address: 120 North LaSalle Street, Suite 1100

City/State/Zip Code: Chicago, IL 60602

Telephone: 312-345-4600

Primary Email: mch@mcgarryllc.com

Secondary Email:

Tertiary Email:

Witness: TIMOTHY BROWN
CLERK OF CIRCUIT COURT

DOROTHY BROWN, Clerk of Court

Date of Service: JUL 13 2017
(To be inserted by officer on copy left with Defendant or other person)

**Service by Facsimile Transmission will be accepted at:

(Area Code)   (Facsimile Telephone Number)

## DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Page 1 of 1

# Exhibit C

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

MCGARRY & MCGARRY, LLC,     )

            )

      Plaintiff,   )

            )

      v.           )     Case No.

            )

BANKRUPTCY MANAGEMENT   )

SOLUTIONS, INC.,      )

            )

      Defendant.   )

2017L007010
CALENDAR/ROOM Y
TIME 00:00
Statutory Action

## DEMAND FOR JURY TRIAL

Pursuant to 735 ILCS 5/2-1105, plaintiff McGarry & McGarry, LLC hereby

demands a trial by jury of all issues in this action that are so triable.

Dated: July 13, 2017

Marianne C. Holzhall
Atty. No. 61677
(mch@mcgarryllc.com)
120 North LaSalle Street, Suite 1100
Chicago, Illinois 60602
(312) 345-4600

Attorney for Plaintiff

Dunnegan & Scileppi LLC
350 Fifth Avenue
New York, New York 10118
(212) 332-8300,

      Of Counsel.

# Exhibit D

IN THE UNITED STATES DISTRICT COURT FOR

THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| MCGARRY & MCGARRY, LLC, | Case No. |
| Plaintiff, | |
| -v- | **AFFIDAVIT OF <u>JONATHAN M. HERMAN</u>** |
| BANKRUPTCY MANAGEMENT SOLUTIONS, INC., | |
| Defendant. | |

STATE OF NEW YORK     )
                         ) ss:
COUNTY OF NEW YORK  )

JONATHAN M. HERMAN, being duly sworn, deposes and says:

1.     I am a partner in the law firm Dorsey & Whitney LLP, counsel to Defendant Bankruptcy Management Solutions, Inc. ("BMS") in the above-entitled case, and submit this affidavit in support of BMS's Notice of Removal.  I am a member of the bar and duly admitted to practice in the State of New York, and will be filing an application for admission pro hac vice herein.  I make this affidavit upon personal knowledge.

2.     On or about July 13, 2017, Plaintiff McGarry & McGarry, LLC, ("Plaintiff") filed an action entitled *McGarry & McGarry, LLC v. Bankruptcy Management Solutions, Inc.,* Case No. 2017L007010, in the Circuit Court of Cook County, County Department, Law Division, State of Illinois, against BMS; and Plaintiff's counsel, William Dunnegan, notified me that day of such filing and provided me with a courtesy copy of the pleadings.

3.     Mr. Dunnegan knew that my firm had previously represented BMS in an identically titled action filed in this Court in 2016 alleging claims of violation of Section 1 of the Sherman Act and 740 ILCS 10/3. That federal court case, with docket number 1:16-cv-08914, was assigned to Judge Joan H. Lefkow, who, on June 16, 2017, dismissed the Sherman Act claim, with prejudice, and dismissed the Illinois Antitrust Act claim, without prejudice, declining to exercise supplemental jurisdiction over that state court claim.

4.     On or about July 18, 2017, BMS was formally served with process in the state court action.

5.     On July 19, 2017, I spoke with Mr. Dunnegan by telephone regarding the case he had filed in state court in Illinois against BMS. He agreed to extend BMS's time to move against or answer the Complaint until September 18, 2017. I asked him how he supported the allegation in paragraphs 2 and 95 of the Complaint in this action that the amount in controversy currently exceeded $30,000, especially inasmuch as BMS's charges allegedly affecting his client were only roughly $514. Moreover, the action had just begun; and the Complaint was almost a verbatim copy of most of the complaint he had previously filed in the now-dismissed federal court case, except that it omitted repeating the Sherman Act claim and added a very few paragraphs of background information.

6.     Mr. Dunnegan responded that all or most of the "several hundred thousand dollars" in legal fees and other expenses incurred in connection with his client's prosecution of the federal court antitrust case counted toward his calculation of the amount in controversy in the state court action he filed. I disputed the legitimacy of that position; but Mr. Dunnegan persisted that he was entitled to make such a claim, and that the jurisdictional threshold for the Law

2

Division was accordingly met.  On July 27, 2017, I requested that Mr. Dunnegan provide

documentation to support his claimed expenses, but he declined to provide it.

      7.     Given the position Mr. Dunnegan has taken, it is clear that Plaintiff claims at least

"several hundred thousand dollars" of legal fees already incurred and that  the amount in

controversy easily exceeds the jurisdictional threshold of $75,000, as required under 28 U.S.C. §

1332(a).  Accordingly, in view of the complete diversity of the parties in this action, there is an

adequate basis for diversity jurisdiction.

 

JONATHAN M. HERMAN


Sworn to before me this

_8th_ day of August, 2017


NOTARY PUBLIC

CHOW LAI CHU
Notary Public, State of New York
No. 01CH4808062
Qualified in Suffolk County
Commission Expires March 30, 20_19_

3