IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MCGARRY & MCGARRY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-CV-5779 |
| | ) | |
| v. | ) | Judge Joan H. Lefkow |
| | ) | |
| BANKRUPTCY MANAGEMENT | ) | |
| SOLUTIONS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO DEFENDANT'S RULE 12(B)(6) MOTION
TO DISMISS THE COMPLAINT

Marianne C. Holzhall (#6204057)
mch@mcgarryllc.com
120 North LaSalle Street, Suite 1100
Chicago, Illinois 60602
(312) 345-4600

William Dunnegan (*pro hac vice*)
wd@dunnegan.com
Dunnegan & Scileppi LLC
350 Fifth Avenue
New York, New York 10118
(212) 332-8300

Attorneys for Plaintiff

**Table of Contents**

Preliminary Statement ................................................................................................. 1

Argument ..................................................................................................................... 1

I.   McGarry Has Standing Under Illinois Law To Recover Damages It Has
     Sustained As A Result Of BMS's Price Fixing Conspiracy ................................. 1

     A.   McGarry Has Standing Even Though It Did Not Purchase
          A Service From BMS ................................................................................... 3

     B.   Collateral Estoppel Should Not Bar McGarry's Claim Under The IAA ....... 6

     C.   In This Case, McGarry's Status As A Creditor Provides It With
          Standing To Assert A Claim Under Illinois Law .......................................... 7

II.  McGarry Has Properly Alleged An Unlawful Price Fixing Conspiracy .................. 8

     A.   McGarry Has Direct Evidence Of An Unlawful Conspiracy ........................ 9

     B.   McGarry Has Circumstantial Evidence Of An Unlawful Conspiracy ......... 10

          1.   BMS, Epiq And TrusteSolutions Charge Excessive Prices ........... 11

          2.   BMS, Epiq And TrusteSolutions Continue Their Unique
               Manner Of Selling And Charging For Their Services
               Despite The Resistance Of Bankruptcy Courts And Trustees ...... 12

          3.   BMS And Epiq Have Publicly Confirmed Their Intention Not
               To Compete On The Basis Of Price ............................................... 14

III. *Noerr* Immunity Does Not Apply To This Conspiracy ........................................... 16

IV.  The Integrated Bankruptcy Case Does Not Provide BMS With A Defense ......... 17

     A.   Waiver Does Not Apply Because McGarry Did Not Intentionally
          Relinquish Its Antitrust Claim Against BMS .............................................. 17

     B.   *Res Judicata* Does Not Apply Because McGarry Did Not Know
          That It Had A Claim Against BMS And Because BMS Was Not
          A Party To The Bankruptcy ....................................................................... 18

     C.   Bankruptcy Law Does Not Bar McGarry's Claim ...................................... 19

Conclusion ................................................................................................................ 20

i

## Table of Authorities

**Cases**

*Alexander v. Chicago Park Dist.,*
773 F.2d 850 (7th Cir. 1985) ...................................................................... 18

*Allied Tube & Conduit Corp. v. Indian Head, Inc.,*
486 U.S. 492 (1988) ......................................................................... 16,17

*Arrigo v. Link,*
836 F.3d 787 (7th Cir. 2016) ...................................................................... 19

*Bell Atlantic v. Twombly*,
550 U.S. 544 (2007) .................................................................. 8, 9, 11

*Blue Shield of Virginia v. McCready,*
457 U.S. 465 (1982) ...................................................................................... 4

*Catalano, Inc. v. Target Sales, Inc.,*
446 U.S. 643 (1980) ....................................................................................... 1

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.,*
690 F.2d 1240 (9th Cir. 1982) .................................................................... 17

*Delta Consulting Grp., Inc. v. R. Randle Const., Inc.,*
554 F.3d 1133 (7th Cir. 2009) ................................................................17-18

*Doe v. Allied-Signal, Inc.,*
985 F.2d 908 (7th Cir. 1993) ...................................................................... 18

*E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.,*
365 U.S. 127 (1961) ...................................................................................... 17

*Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.,*
806 F.3d 162 (3d Cir. 2015),
*cert. denied sub nom.*
*Vill. Supermarkets, Inc. v. Hanover 3201 Realty, LLC.,*
136 S. Ct. 2451, 195 L. Ed. 2d 264 (2016) ...............................................4-5

*H–D Mich., Inc. v. Top Quality Serv., Inc.,*
496 F.3d 755 (7th Cir. 2007). .......................................................................7

*Himel v. Continental Ill. Nat. Bank & Trust Co. of Chicago,*
596 F.2d 205 (7th Cir.1979) ...................................................................... 18

*Holzrichter v. Cty. of Cook*,
231 Ill. App. 3d 256, 595 N.E.2d 1237 (Ill. App. 1992) ................................................... 2

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977) .........................................................................................*passim*

*In re Aluminum Warehousing Antitrust Litig.*,
95 F. Supp.3d 419 (S.D.N.Y. 2015)
*motion to certify appeal denied,*
2015 WL 4646822 (S.D.N.Y. May 14, 2015) ................................................................ 4

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
2016 WL 7805628 (N.D. Cal. Aug. 4, 2016) ................................................................. 8

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
681 F. Supp.2d 141 (D. Conn. 2009) ........................................................................ 15

*In re High Fructose Corn Syrup Antitrust Litig.*,
261 F. Supp.2d 1017 (C.D. Ill. 2003) ................................................................... 15-16

*In re Indus. Marine Diesel, Inc.*,
1997 WL 33474937 (Bankr. S.D. Ga. Jan. 31, 1997) ................................................... 5

*In re Southmark Corp.*,
163 F.3d 925 (5th Cir. 1999) ............................................................................ 19-20

*In re Text Messaging Antitrust Litig.*,
630 F.3d 622 (7th Cir. 2010) ......................................................................... 10, 15

*In re Text Messaging Antitrust Litig.*,
782 F.3d 867 (7th Cir. 2015) ................................................................................ 16

*In re Titanium Dioxide Antitrust Litig.*,
959 F. Supp.2d 799 (D. Md. 2013) ......................................................................... 15

*In re Zinc Antitrust Litig.*,
155 F. Supp.3d 337 (S.D.N.Y. 2016) ........................................................................ 4

*Loeb Indus., Inc. v. Sumitomo Corp.*,
306 F.3d 469 (7th Cir. 2002) ............................................................................. 3, 6

*Mandarino v. Pollard*,
718 F.2d 845 (7th Cir. 1983) ............................................................................... 18

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ......................................................................................... 15

*Matrix IV, Inc. v. Am. Nat. Bank & Tr. Co. of Chicago*,
649 F.3d 539 (7th Cir. 2011). .......................................................................... 6-7

*Matter of Salzer*,
52 F.3d 708 (7th Cir. 1995) ............................................................................ 3, 7

*Minn-Chem, Inc. v. Agrium, Inc.*,
683 F.3d 845 (7th Cir. 2012) ........................................................................... 15

*Moore v. Lumpkin*,
258 Ill. App. 3d 980, 630 N.E.2d 982 (Ill. App. 1994) ....................................... 2

*Nelson v. Monroe Regional Medical Center*,
925 F.2d 1555 (7th Cir. 1991). ......................................................................... 2

*Parker v. Brown*
317 U.S. 341 (1943) ......................................................................................... 16

*Popp v. Cash Station, Inc.*,
244 Ill. App. 3d 87, 613 N.E.2d 1150 (Ill. App. Ct. 1992)................................... 2

*Premier Elec. Const. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*,
814 F.2d 358 (7th Cir. 1987) ........................................................................... 16

*Ryder v. Bank of Hickory Hills,*
146 Ill. 2d 98, 585 N.E.2d 46 (Ill. 1991) .......................................................... 18

*Sawyer Realty Grp., Inc. v. Jarvis Corp.*,
89 Ill. 2d 379, 432 N.E.2d 849 (1982)................................................................ 2

*Serpa Corp. v. McWane, Inc.*,
199 F.3d 6 (1st Cir. 1999) .............................................................................. 5-6

*Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of Rhode Island*,
997 F. Supp.2d 142 (D.R.I. 2014) ...................................................................... 6

*Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*,
830 F.2d 1374 (7th Cir. 1987) ........................................................................... 7

**Statutes and Rules**

11 U.S.C. § 330............................................................................................... 17

11 U.S.C. § 350................................................................................................. 5

11 U.S.C. § 704 ..................................................................................... 7-8

28 U.S.C. § 157 .................................................................................... 19

28 U.S.C. § 1334 .................................................................................. 19

DPHA, 20 ILCS 2305/2 (West 1992) ....................................................... 2

Fed R. Civ. P. 15 .................................................................................. 20

Illinois Antitrust Act, 740 ILCS 10/3 ..................................................... 1

Illinois Antitrust Act, 740 ILCS 10/7 ................................................. 1, 2, 3, 7

Illinois Antitrust Act, 740 ILCS 10/11 ................................................. 4

**Other**

William E. Kovacic, *et al.*, *Plus Factors and Agreement in Antitrust Law*, 110
   Mich. L. Rev. 393, 414 (2011) ....................................................... 11, 13

## Preliminary Statement

This action presents the question of whether the nation's three largest providers of bankruptcy software services to Chapter 7 Estates have unlawfully conspired to fix the method for charging for their services.

Based upon the direct and circumstantial evidence set forth in the complaint, there can be no reasonable dispute that McGarry has a credible argument that BMS, Epiq, and TrusteSolutions conspired (i) to sell Chapter 7 Estates bankruptcy software services only in combination with bankruptcy banking services, and (ii) to charge Chapter 7 Estates no fee for those combined services other than a percentage of the amount in the bank account of the Estate. (Dkt. 1 at 18-29/53, ¶¶ 57-89)  Such a conspiracy would constitute a form of price fixing that is *per se* illegal. *See Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 650 (1980) ("[A]n agreement among competing wholesalers to refuse to sell unless the retailer makes payment in cash either in advance or upon delivery is 'plainly anticompetitive.'").

The small size of McGarry's claim does not accurately reflect the significance of the issues involved in this case.  A decision on the merits of this action will impact not only McGarry, but the creditors in virtually every Chapter 7 asset case – whether currently open or closed – since mid-2012.

## Argument

**I.     McGarry Has Standing Under Illinois Law To Recover Damages
It Has Sustained As A Result Of BMS's Price Fixing Conspiracy.**

The Illinois Antitrust Act ("IAA"), specifically 740 ILCS 10/3, makes horizontal price fixing illegal.  740 ILCS 10/7 confers a broad range of persons with standing to recover damages to remedy that illegal price fixing. It provides:

Sec. 7. The following civil actions and remedies are authorized under this Act: . . . .

    (2) Any person who has been injured in his business or property, or is threatened with such injury, by a violation of Section 3 of this Act may maintain an action in the Circuit Court for damages, or for an injunction, or both, against any person who has committed such violation. . .

The Illinois Legislature confirmed the breadth of section 10/7 by enacting a statute that repealed the effect of the Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). 740 ILCS 10/7(2) provides that "[n]o provision of this Act shall deny any person who is an indirect purchaser the right to sue for damages."

The question of whether McGarry has standing to assert a claim under IAA depends on an interpretation of the IAA. *Moore v. Lumpkin*, 258 Ill. App. 3d 980, 989, 630 N.E.2d 982, 989 (Ill. App. 1994)("We first consider whether a private right of action exists for violations of section 2 of the DPHA, 20 ILCS 2305/2 (West 1992). In making that determination, the primary focus is on the intent of the legislature in enacting the statute.")(citing *Sawyer Realty Grp., Inc. v. Jarvis Corp.*, 89 Ill. 2d 379, 388, 432 N.E.2d 849, 853 (1982)).

To have standing to bring a claim under the IAA, a plaintiff must only plead that he was proximately injured by the anticompetitive effect of an antitrust violation. *Holzrichter v. Cty. of Cook*, 231 Ill. App. 3d 256, 266, 595 N.E.2d 1237, 1243 (Ill. App. 1992)("The pleading of a recognized antitrust injury is an essential element of the action and also provides the plaintiff's requisite standing."). "Antitrust injury 'means injury from higher prices or lower output, the principal vices proscribed by the antitrust laws.'" *Popp v. Cash Station, Inc.*, 244 Ill. App. 3d 87, 101, 613 N.E.2d 1150, 1158 (Ill. App. 1992)(quoting *Nelson v. Monroe Regional Medical Center*, 925 F.2d 1555, 1564 (7th Cir. 1991)).

2

Here, McGarry alleged that BMS entered into an unlawful price fixing conspiracy with its horizontal competitors. (Dkt. 1 at 7/53, ¶ 1) The purpose and effect of this price fixing conspiracy was to raise prices, in the form of an overcharge to the Estate of Integrated Genomics. (Dkt. 1 at 29/53, ¶¶ 91-92) The purpose of a Chapter 7 Estate, and the Chapter 7 trustee, is to distribute the debtor's assets to its creditors. *Matter of Salzer*, 52 F.3d 708, 712 (7th Cir. 1995)("The trustee has a statutory duty to collect and liquidate the property of the estate."). The overcharge was therefore in fact passed on, dollar for dollar, to creditors including McGarry. McGarry therefore suffered a proximate economic injury as a direct result of this overcharge because this overcharge was paid out of funds that McGarry would have otherwise received. (Dkt. 1 at 17/53, ¶ 55)

### A. McGarry Has Standing Even Though It Did Not Purchase A Service From BMS.

The plain meaning of section 740 ILCS 10/7 does not limit standing to those who have made purchases. Standing extends to "any person injured in its business or property." Although the statute could have been easily written to limit standing to purchasers of products or services who paid prices that were fixed in violation of the statute, the statute does not provide such a limitation.

Neither the Supreme Court nor the Illinois legislature have ever determined that non-purchasers, who were proximately injured by the anti-competitive effect of an antitrust violation, could not bring suit. *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 481 (7th Cir. 2002)("*Illinois Brick* does not stand for the proposition, as the defendants would seem to have it, that a defendant cannot be sued under the antitrust laws by any plaintiff to whom it does not sell (or from whom it does not purchase).").

3

The IAA provides that it should be interpreted – except for the *Illinois Brick* repealer exception – consistently with federal law. 740 ILCS 10/11("When the wording of this Act is identical or similar to that of a federal antitrust law, the courts of this State shall use the construction of the federal law by the federal courts as a guide in construing this Act.").

Federal courts have consistently permitted non-purchasers to assert price fixing claims when they demonstrate that the injury they sustained proximately resulted from the price fixing. *In re Zinc Antitrust Litig.*, 155 F. Supp.3d 337, 360 (S.D.N.Y. 2016)(plaintiffs, consumers of zinc, possessed antitrust standing to bring price fixing claim even though plaintiffs never bought zinc from the financial firms or warehouses); *In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp.3d 419, 442 (S.D.N.Y. 2015), *motion to certify appeal denied,* 13-MD-2481 KBF, 2015 WL 4646822 (S.D.N.Y. May 14, 2015)(plaintiffs, consumers of aluminum, possessed antitrust standing to bring price fixing claim against financial firms and warehouses that manipulated the price of zinc even though plaintiffs never bought zinc from the financial firms or warehouses).

Moreover, federal courts have permitted non-purchasers to bring non-price fixing claims. *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 474 (1982)(permitting insured to bring antitrust claim against an insurance company for conspiring with psychiatrists to refuse to reimburse insureds for treatment by psychologists, even though plaintiff never purchased insurance*); Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 174 (3d Cir. 2015), *cert. denied sub nom. Vill. Supermarkets, Inc. v. Hanover 3201 Realty, LLC.*, 136 S. Ct. 2451, 195 L. Ed. 2d 264 (2016)(real estate developer attempting to build supermarket on behalf of chain

4

permitted to bring monopolization claim against incumbent supermarket chain which opposed entry of chain into market).

Moreover, unless McGarry's pending motion to reopen the *Integrated Genomics*, 11-19086 (CAD) case succeeds, McGarry should have standing because otherwise no one else will be able to assert the price fixing claim against BMS. The decision of this Court in the prior action between the parties stated:

> Although McGarry alleges that it is the only party that could bring an antitrust claim, this is not the case, as the Bankruptcy Code, 11 U.S.C. § 350, permits any interested party to move to reopen an estate. For example, a debtor may petition to reopen an estate specifically to investigate a potential antitrust claim. *See, e.g., In re Indus. Marine Diesel, Inc.*, No. 92-20668, 1997 WL 33474937, at *4 (Bankr. S.D. Ga. Jan. 31, 1997) (reopening an estate to allow it to pursue an antitrust claim that was based on facts discovered after the bankruptcy case had closed). (16 Civ. 8914; Dkt. 49 at 5/8)

In response, McGarry requested that the Trustee of the Estate, Eugene Crane, move to reopen the *Integrated Genomics* case. (11-19086; Dkt. 85-3 at 2/2)   He declined. (11-19086; Dkt. 85-4 at 2/2)  McGarry therefore moved to reopen the bankruptcy case and for derivative standing to assert antitrust claims against BMS on behalf of the Estate. (11-19086; Dkt. 85 at 2/23)   BMS and the U.S. Trustee have opposed the motion. (11-19086; Dkt. 91)  The Bankruptcy Court has set a briefing schedule, with a ruling date of October 26, 2017. (11-19086; Dkt. 94)   Unless the bankruptcy court grants McGarry derivative standing, McGarry will be the only person who can assert the price fixing claim.

The Court should not tolerate a situation where an antitrust claim exists, but no one can assert it. *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 12 (1st Cir. 1999)("[W]e recognize that there may be some instances where presumptively disfavored plaintiffs

do have standing to bring an antitrust action..… This Court has stated that the 'most obvious reason for conferring standing on a second-best plaintiff is that, in some general category of cases, there may be no first best with the incentive to sue.'"); *Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of Rhode Island*, 997 F. Supp.2d 142, 160 (D.R.I. 2014)("Regardless, even if the Court were to conclude that Steward is a presumptively disfavored plaintiff, this case is one in which there exists no other party with the incentive or ability to sue.").

Allowing a disfavored plaintiff to bring suit avoids a situation where the defendant's illegal behavior goes unpunished. *Steward*, 997 F. Supp.2d at 160;  *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 483 (7th Cir. 2002)("This scheme at times favors plaintiffs (*Hanover Shoe*) and at times defendants (*Illinois Brick*), but it never operates entirely to preclude market recovery for an injury.").

Accordingly, the text of the IAA and these federal decisions should compel the Court to conclude that McGarry has standing even though it was not a direct purchaser from BMS.

**B.    Collateral Estoppel Should Not Bar McGarry's Claim Under The IAA.**

Application of collateral estoppel requires that the issues involved in the two actions be the same. *Matrix IV, Inc. v. Am. Nat. Bank & Tr. Co. of Chicago*, 649 F.3d 539, 547 (7th Cir. 2011)("For collateral estoppel to apply, '(1) the issue sought to be precluded must be the same as that involved in the prior litigation, (2) the issue must have been actually litigated, (3) the determination of the issue must have been essential to the final judgment, and (4) the party against whom estoppel is invoked must be fully

represented in the prior action.'")(quoting *H–D Mich., Inc. v. Top Quality Serv., Inc.,* 496 F.3d 755, 760 (7th Cir.2007)).

Here, the issues of standing under federal law and standing under state law are different. As noted above, Illinois has repealed, in section 10/7, the effect of the Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). BMS concedes that, in the prior action, this Court "determined that [McGarry's] federal claim was barred under the *Illinois Brick* doctrine." (Dkt. 25-1 at 9/26) The present action under state law therefore presents a different issue than standing under federal law, which the Court decided in the prior action. Perhaps for that reason, this Court did not dismiss McGarry's state law claim in the prior action with prejudice, but dismissed it so that McGarry would have its day in court to assert its claim under Illinois law.

### C. In This Case, McGarry's Status As A Creditor Provides It With Standing To Assert A Claim Under Illinois Law.

While BMS argues that McGarry's injury merely derives from the Estate, that fact should not provide a sufficient basis to rule that McGarry lacks standing.

A Chapter 7 Estate does not fit within the rule applicable to stakeholders in operating companies, such as in *Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830 F.2d 1374, 1378 (7th Cir. 1987)("Merely derivative injuries sustained by employees, officers, stockholders, and creditors of an injured company do not constitute 'antitrust injury' sufficient to confer antitrust standing."). The purpose of a Chapter 7 Estate is to distribute the debtor's assets to its creditors. *Matter of Salzer*, 52 F.3d 708, 712 (7th Cir. 1995)("The trustee has a statutory duty to collect and liquidate the property of the estate."). *See also* 11 U.S.C. § 704(a)(1) ("The trustee shall...collect and reduce to money the property of the estate for which such trustee serves, and close

7

such estate as expeditiously as is compatible with the best interests of parties in interest...").

Because it does not operate a business to generate a profit, a Chapter 7 Estate more closely resembles a principal/agent relationship, where the principal has standing to sue despite the general derivative standing rule. *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 1917, 2016 WL 7805628, at *14 (N.D. Cal. Aug. 4, 2016)("Typically, the first party to purchase a price-fixed good is considered the direct purchaser. Where, however, that party is merely a purchasing agent for the party to whom it later resells the price-fixed good (*i.e.*, the principal), the principal will have standing as the direct purchaser, not the agent.").

In any event, McGarry should have standing if the Estate will not be reopened. Otherwise, BMS will not be held accountable for the damages resulting from its illegal price fixing.

## II.   McGarry Has Properly Alleged An Unlawful Price Fixing Conspiracy.

BMS argues that McGarry's pleading does not satisfy the pleading requirements of *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), because (i) McGarry has failed to plead "who, did what, to whom (or with whom), where, and when?" (Dkt. 25-1 at 15/26) and (ii) that McGarry has failed to plead "factual allegations 'plausibly suggesting (not merely consistent with) agreement.'" (Dkt. 25-1 at 13/26(quoting *Twombly* at 557.)).

BMS's first argument has no merit. The complaint alleges that BMS conspired with its two largest competitors – Epiq and TrusteSolutions – in verbal communications at least through their partner banks, prior to November 26, 2010, (i) to sell Chapter 7 Estates bankruptcy software services only in combination with bankruptcy banking

8

services, and (ii) to charge Chapter 7 Estates no fee for those combined services other than a percentage of the amount in the bank account of the Estate. (Dkt. 1 at 18-29/53, ¶¶ 57-89)  BMS's argument that McGarry has not alleged sufficient facts concerning a conspiracy is meritless.  (*Compare* the complaint in *Twombly*, a copy of which is annexed as Exhibit A.)

BMS's second argument, that McGarry's allegation of a conspiracy is not plausible, has no greater merit.  McGarry has marshalled both direct and circumstantial evidence that a price fixing conspiracy (Dkt. 1 at 18-29/53; ¶¶ 59-89) is far more than "plausible."

### A.    McGarry Has Direct Evidence Of An Unlawful Conspiracy.

Exhibit A to the complaint demonstrates that on November 26, 2010, BMS wrote to a representative of EOUST that BMS and the partner banks of one or more of its horizontal competitors had "**several conversations**" and "**determined**," that there was "**a single structural option**" to their pricing problems.  That "single structural option" was a combined fee to Chapter 7 Estates for banking and support services based upon, and only upon, the amount of money in the Estate.  The BMS proposal provided:

> **In several conversations with various participant banks, a number of options have been discussed.  Satisfying all of the conditions presented above, however, left a single structural option**.  Although the numbers vary slightly for each bank, the structure is constant with two key components:
>
> First, since estates do not currently pay for services (banking and software) through a reduction in their interest income, **have them continue to pay for these services via a service fee, as a % of average deposit balance assessed monthly on each account.**…
>
> **Having determined a structural solution**, the principal remaining question of each bank was "what do you need to financially continue to participate in the Chapter 7 process including your expenses for administration and to fund your current software providers?"  (Dkt. 1 at 19, ¶ 61,35-36/53,

9

¶ 61)(emphasis added)

Exhibit B to the complaint demonstrates that on January 14, 2011, the largest competitor of BMS, Epiq, responded to BMS's written proposal, and agreed that BMS's proposal "features well reasoned characteristics." (Dkt. 1 at 20, at 40/53; ¶ 64)  Epiq's response therefore strongly suggests that the two largest competitors in the national market for bankruptcy support services had previously reached an agreement concerning fixing the manner of selling and charging for bankruptcy software services.

On January 21, 2011, nine days after Epiq's response to BMS's proposal, the second-largest competitor of BMS, TrusteSolutions, chimed in to affirm its involvement in to the conspiracy.  Specifically, TrusteSolutions and its affiliated bank announced that they intended to sell combined software and banking services, and charge for those combined services a percentage of the amount in the bank account of the Estate. (Dkt. 1 at 20-21, 45/53, ¶ 66)  TrusteSolutions or its bank communicated that information to BMS. (Dkt. 1 at 21/53 ¶ 67)

While BMS spins the words of these communications to argue that the horizontal competitors acted independently, or alternatively that they only agreed to petition the EOUST (Dkt. 25-1 at 14-15/26), these written communications between horizontal competitors provide direct evidence of a price fixing conspiracy.  To suggest that the BMS proposal is, as a matter of law, nothing more than independent action, or an agreement to petition the government, borders on frivolous.

## B.    McGarry Has Circumstantial Evidence Of An Unlawful Conspiracy.

Even without this direct evidence, "[c]ircumstantial evidence can establish an antitrust conspiracy."  *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010).  There is no dispute that BMS, Epiq and TrusteSolutions have engaged in

10

parallel conduct. All three companies (i) sell bankruptcy software services only in combination with bankruptcy banking services, and (ii) charge an Estate no fee for those combined services other than a percentage of the amount of money in the bank account of the Estate. (Dkt. 1 at 14-15/53; ¶ 36) This is extraordinary behavior. We know of no other company, in any industry, that has succeeded in pricing its goods or services based upon the amount of money in its customer's bank account. (What would happen if Microsoft attempted to license WORD® to its customers only in exchange for a percentage of the money in their bank account?)

McGarry has also pled six "plus factors." (Dkt. 1 at 21-29/53; ¶ 68-89) These "plus factors" establish that this parallel manner of selling and charging for bankruptcy software services would "probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties," *Twombly*, 550 U.S. at 556 n. 4, but would result from a conspiracy concerning the manner of selling and charging for bankruptcy software services. Three "plus factors" are especially important.

### 1.     BMS, Epiq And TrusteSolutions Charge Excessive Prices.

Cartels "[r]aise prices above what they would have been without the conspiracy." William E. Kovacic, *et al.*, *Plus Factors and Agreement in Antitrust Law*, 110 Mich. L. Rev. 393, 414 (2011).

Epiq admitted to the government that a "reasonable" price, except in rare circumstances, would be "0.50% – 0.75%." (Dkt. 1 at 28-29/53; ¶ 89) Epiq nevertheless charged, and continues to uniformly charge, 1.75 percent of the amount of money in the bank account of the Estate. (Dkt. 1 at 15/53; ¶ 40) This is more than

11

twice the amount that Epiq admitted was reasonable. (Dkt. 1 at 28-29/53; ¶ 89) BMS charges the same 1.75 percent, while TrusteSolutions charges 1.9 percent. (Dkt. 1 at 15/53; ¶ 40) BMS offers no financial data to demonstrate that its percentage fees bear a reasonable relationship to the services that BMS provides.

In response to this allegation that the conspirators charge more than twice the amount that Epiq represented was reasonable, BMS argues that their rates are not as high as they used to be. (Dkt. 25-1 at 20/26) Any reduction in their rates to a less excessive, but still excessive, level does not suggest the absence of a conspiracy.

### 2. BMS, Epiq And TrusteSolutions Continue Their Unique Manner Of Selling And Charging For Their Services Despite The Resistance Of Bankruptcy Courts And Trustees.

The model BMS, Epiq and TrusteSolutions use to sell and charge for bankruptcy software services is unique. Any of the three companies could (i) sell a copy of the software to trustees for a one-time payment, or (ii) license the software to trustees on a one-time, periodic, or per-case basis. Similarly, any of the three companies could (i) sell or license the software apart from banking services, or (ii) charge for those combined services an amount other than a percentage of the amount in the bank account of the Estate. The record contains no precedent – in any industry, at any time – for the model that BMS, Epiq and TrusteSolutions have adopted.

Bankruptcy courts and trustees have pressured the three companies to change their model and sell bankruptcy software services separate from bankruptcy banking services. (Dkt. 1 at 25-26/53; ¶¶ 76-79) The three companies have nevertheless resisted that pressure, and refused to sell bankruptcy software services separate from bankruptcy banking services. (Dkt. 1 at 27/53; ¶ 83) In the Western District of New

12

York, for example, BMS "declined to change its pricing model to one acceptable to the bankruptcy court…" (Dkt. 25-1 at 19/26)   Consistent with the conspiracy, BMS refused to provide any services in that District.  (Dkt. 1 at 26-27/53; ¶ 82)

The complaint alleges that a company, acting independently in the face of this pressure, should offer to provide a separate software license. (Dkt. 1 at 26-27/53; ¶ 82) Refusing to provide a separate software license in response this pressure would make sense if, and only if, a company knew that the two remaining competitors would, as the result of a conspiracy, also refuse to offer a separate software license.

BMS argues to the contrary. (Dkt. 25-1 at 19-20/26)   BMS argues that it made sense for BMS to withdraw from the Western District of New York because if BMS offered to provide a separate software license in that District, then BMS would have to offer a separate software license in the rest of the country, which BMS alleges would be "unsustainable." (Dkt. 25-1 at 19/26)

BMS's argument is contrary to prevailing economic theory.  Independent actors need to respond to the laws of supply and demand, while price fixers do not.  *See* Kovacic, at 410 ("[I]f the buyers are active players in the oligopoly game and if the price of $25 persists, then the firms must be communicating beyond the simple announcement of prices and potentially also transferring resources among one another, since without such seller conduct the price would tumble toward $10 given the strength of the buyer resistance....").  Thus, without a conspiracy among BMS, Epiq, and TrusteSolutions, BMS would have faced the risk that one of the other companies would have offered a separate software license to capture the revenue from that District.  If one of them did, that model would have the same chance of spreading nationwide as if

13

BMS had offered a separate software license. With the conspiracy, however, BMS faced a substantially reduced risk that its withdrawal from that District would have any material consequence because the other companies would not offer a separate software license either. Accordingly, BMS would only choose to withdraw from that District if BMS knew, based upon its conspiracy, that neither Epiq nor TrusteSolutions would offer a separate software license. Neither of them did. (Dkt. 1 at 27/53; ¶ 83.)

### 3. BMS And Epiq Have Publicly Confirmed Their Intention Not To Compete On The Basis Of Price.

BMS and Epiq each have repeated and publicly stated that they do not compete based on the manner of selling and charging for their services. (Dkt. 1 at 22-25/53 at ¶¶ 71-75) These statements encouraged the other companies to maintain their conspiracy to fix the manner of selling and charging for bankruptcy software services. For example, BMS represented to a bankruptcy court:

> While the trustee services business may, if this interest rate environment continues, ultimately evolve to a different model, where pricing is based on a set schedule of fees and charges for numbers and types of transactions, at this point, that is simply not a business model that BMS and BNY Mellon are prepared to offer. **When and if any other providers are willing to offer services under such a model, trustees of course have the ability to terminate their arrangements with BMS and BNY Mellon on 30 days notice, and to contract with such providers**… (Emphasis added.)

(Dkt. 1 at 24/53; ¶ 74) BMS is only taking such a "my way or the highway" position with the bankruptcy court because BMS knows – as a result of their conspiracy – that Epiq and TrusteSolutions will not offer any different deal than BMS.

While BMS again attempts to spin the meaning of these statements (Dkt. 25-1 at 17-19/26), BMS should make those types of arguments to the jury in closing, not to the Court on a motion to dismiss.

14

McGarry has alleged more evidence to support a finding of a conspiracy than the Court of Appeals found to be sufficient in *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628-29 (7th Cir. 2010). *See Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012). *See also In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp.2d 141, 178 (D. Conn. 2009)("Based on the evidence of parallel conduct, in addition to the evidence submitted in support of the three plus factors, I conclude that the plaintiffs have successfully raised a genuine issue of material fact whether the DSM defendants were active participants in a price-fixing scheme in the U.S. EPDM market."); *In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp.2d 799, 824 (D. Md. 2013)("Second, that this case depends wholly on circumstantial evidence holds no sway...Though 'antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case,' [*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 588 (1986)], this Court finds that the Plaintiffs have met their burden at the summary judgment stage because a jury, viewing the evidence in the totality, could reasonably infer a price-fixing conspiracy by the Defendants."); *In re High Fructose Corn Syrup Antitrust Litig.*, 261 F. Supp.2d 1017, 1022, 1026 (C.D. Ill. 2003)("There are no examples of direct evidence in this case, and Gray must therefore attempt to make a sufficient showing via circumstantial evidence... the Court is compelled to conclude here that, when viewed in the light most favorable to Gray, the economic evidence, in combination with the totality of the rather ambiguous conduct evidence, is marginally sufficient to allow a reasonable inference that Plaintiffs' hypothesis of collusive action is more plausible than that of individual action."). *Compare In re Text Messaging Antitrust Litig.*, 782 F.3d 867 (7th Cir. 2015).

15

**III.**  **_Noerr_ Immunity Does Not Apply To This Conspiracy**

*E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), immunizes from antitrust liability certain acts of petitioning the government. *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988); *Premier Elec. Const. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*, 814 F.2d 358, 376 (7th Cir. 1987)("If the injury is caused by persuading the government, then the antitrust laws do not apply to the squelching (*Parker v. Brown* [317 U.S. 341 (1943)]) or the persuasion (*Noerr-Pennington*).").

McGarry is not alleging that BMS's or its co-conspirators' petition of the EOUST violated the IAA.  Rather, McGarry is alleging that the anti-competitive injury resulted from the horizontal conspiracy of BMS, Epiq, and TrusteSolutions to fix the way that they sell and charge for bankruptcy software services. (Dkt. 1 at 18/53; ¶¶ 57-58)  The petitions of BMS and its co-conspirators are merely evidence of the conspiracy to fix the method of charging for and providing bankruptcy software services.

BMS argues that *Noerr* immunizes its horizontal conspiracy only because, after the conspiracy occurred, BMS and its conspirators jointly lobbied the EOUST to change its rule to allow the routine deduction of the fees from the bank account of the Estate without bankruptcy court approval (Dkt. 1 at 13/53 ¶ 29), to make their existing conspiracy easier to execute.

*Noerr*, however, does not immunize that type of conduct.  Conspirators cannot immunize their unlawful conspiracy by petitioning the government to bless their conspiracy. *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 503 (1988)("If all such conduct were immunized then, for example, competitors would be

free to enter into horizontal price agreements as long as they wished to propose that price as an appropriate level for governmental ratemaking or price supports."). *See Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1264 (9th Cir. 1982)("If Clipper can prove that the defendants engaged in activities which violated the antitrust laws, those violations do not become immune simply because the defendants used legal means-protests before the ICC-as a means to enforce the violations.").

Petitioning the government was not even essential to execute the conspiracy. For example, BMS, Epiq, and TrusteSolutions could have executed their conspiracy without petitioning the EOUST by invoicing the Chapter 7 Trustees, who could seek approval from the bankruptcy court under 11 U.S.C. § 330 to pay the invoice from the Estate.

## IV.     The Integrated Bankruptcy Case Does Not Provide BMS With A Defense.

BMS raises three affirmative defenses related to the *Integrated Genomics* bankruptcy case, attempting to establish them as a matter of law based upon the face of the complaint.

### A.     Waiver Does Not Apply Because McGarry Did Not Intentionally Relinquish Its Antitrust Claim Against BMS.

Waiver is an intentional relinquishment of a known right.  *Delta Consulting Grp., Inc. v. R. Randle Const., Inc.*, 554 F.3d 1133, 1140 (7th Cir. 2009)("In Illinois, waiver is the voluntary and intentional relinquishment of a known right."); *Ryder v. Bank of Hickory Hills,* 146 Ill. 2d 98, 104, 585 N.E.2d 46, 49 (Ill. 1991)("Waiver is defined as the intentional relinquishment of a known right.").

17

The record contains no evidence that McGarry knew it had an antitrust claim against BMS on April 14, 2014, upon the filing of the Trustee's final accounting and distribution report. BMS fails to demonstrate that filings in different cases and different judicial districts – of which McGarry was unaware until about May 2016 – provide inquiry notice of the current antitrust claim.

### B. *Res Judicata* Does Not Apply Because McGarry Did Not Know That It Had A Claim Against BMS And Because BMS Was Not A Party To The Bankruptcy.

*Res judicata* does not bar unknown claims**.** *Doe v. Allied-Signal, Inc.*, 985 F.2d 908, 914 (7th Cir. 1993)("If the plaintiff is unaware of facts when filing a complaint, *res judicata* will not bar subsequent litigation. *Himel v. Continental Ill. Nat. Bank & Trust Co. of Chicago,* 596 F.2d 205, 210 (7th Cir.1979).").  There is no evidence that McGarry knew it had an antitrust claim when it filed its proof of claim, or even before the bankruptcy case closed.

In addition, *res judicata* does not bar claims that arise out of a transaction that is separate from the underlying litigation. A transaction consists of "'a single core of operative facts' which give rise to a remedy." *Alexander v. Chicago Park Dist.,* 773 F.2d 850, 854 (7th Cir. 1985)(quoting *Mandarino v. Pollard,* 718 F.2d 845, 849 (7th Cir. 1983)). Here, McGarry's antitrust claim against BMS arises out of a markedly different set of facts than the facts related to the administration of the Estate.

Additionally, *res judicata* does not bar claims where, as here, there is no identity of parties in the prior proceeding. *Arrigo v. Link*, 836 F.3d 787, 798–99 (7th Cir. 2016)("Res judicata, and in particular claim preclusion, bars claims that were litigated or could have been litigated in a previous proceeding when three elements are met: (1)

18

identity of the parties or their privies between the two actions; (2) a final judgment on the merits in an earlier proceeding; and (3) identity of the causes of action." BMS was not a party to the bankruptcy action.

### C. Bankruptcy Law Does Not Bar McGarry's Claim.

Bankruptcy courts do not have exclusive jurisdiction to adjudicate any cases. Rather, under 28 U.S.C. § 157(a), bankruptcy courts have jurisdiction to adjudicate cases when a district court delegates that authority. Even then, that authority of the bankruptcy court is not exclusive. 28 U.S.C. §157(b)(1), which BMS does not quote, provides that "Bankruptcy judges <u>may</u> hear and determine all cases under title 11 and all core proceedings arising under title 11 or arising in a case under title 11…" (emphasis added). No statute grants bankruptcy courts exclusive jurisdiction over claims that fall within this category. That is especially true when the bankruptcy case has closed before the creditor has discovered the claim against a person who was not a party to the bankruptcy case.

BMS's argument is illogical. BMS reasons that because the bankruptcy court has authority to entertain a "core proceeding," core proceedings must be litigated in bankruptcy court. That is a *non-sequitur*.

*In re Southmark Corp.*, 163 F.3d 925 (5th Cir. 1999), upon which BMS relies, is inapposite because it involved the decision of a bankruptcy court not to abstain pursuant to 28 U.S.C. § 1334(c) from hearing a claim, against the accountant for the Estate, that the debtor filed in state court and the accountant removed to bankruptcy court. *Id.* at 932. ("Because this is a core proceeding, the bankruptcy court had

discretion whether to abstain from hearing it. We hold that the court did not abuse his discretion in declining to abstain.").

## <u>Conclusion</u>

The Court should deny the motion of BMS in its entirety. If the Court grants that motion in any respect, McGarry respectfully requests leave pursuant to Fed R. Civ. P. 15 to replead.

Dated: October 10, 2017

s/ Marianne C. Holzhall_____
Marianne C. Holzhall (#6204057)
(mch@mcgarryllc.com)
120 North LaSalle Street, Suite 1100
Chicago, Illinois 60602
(312) 345-4600

DUNNEGAN & SCILEPPI LLC

By William Dunnegan
   William Dunnegan (*pro hac vice*)
   wd@dunnegan.com
350 Fifth Avenue
New York, New York 10118
(212) 332-8300

Attorneys for Plaintiff